David **BROAD** et al.,
Plaintiffs-Appellants,

v.

**ROCKWELL INTERNATIONAL
CORPORATION et al.,**
Defendants-Appellees.

No. 77–2963.

United States Court of Appeals,
Fifth Circuit.

April 17, 1981.

John Andrew Martin, Dallas, Tex., Hugo L. Black, Jr., Thomas H. Seymour, Kenney, Nachwalter & Seymour, Miami, Fla., for plaintiffs-appellants.

Ernest E. Figari, Jr., Johnson, Swanson & Barbee, Dallas, Tex., Donald I. Strauber, Edwin D. Scott, Terry A. Thompson, John J. Kallaugher, Chadbourne, Parker, Whiteside & Wolff, New York City, for Rockwell Intern. Corp., Collins Radio Co., Anderson, Bateman, Booth, Willard F. Rockwell, Jr., Roodhouse, Beall, Cattoi, Fulgham, Martin, Erickson, Drick and Raff.

William B. West, III, Clark, West, Keller, Butler & Ellis, Dallas, Tex., for U. S. Trust Co. of New York.

John F. Egan, Curtis, Mallet-Prevost, Colt & Mosle, New York City, for U. S. Trust Co. of New York.

James K. Manning, Brown, Wood, Ivey, Mitchell & Petty, New York City, for Brown, Wood, Ivey, Mitchell & Petty.

William J. Fitzpatrick, Atty., New York City, for Securities Industry Assoc.

Stanley T. Kaleczyc, Jr., National Chamber Litigation Center, Inc., Washington, D. C., for Chamber of Commerce of U. S. A.

Leonard Joseph, Dewey, Ballentine, Bushby, Palmer & Wood, New York City, for Donaldson, Lufkin & Jenrett, Inc., et al.

William H. Smith, American Bankers Assoc., Washington, D. C., for American Bankers Assoc.

Before GODBOLD, Chief Judge, BROWN, COLEMAN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAM D. JOHNSON, THOMAS A. CLARK, and WILLIAMS, Circuit Judges.

RANDALL, Circuit Judge:

This case, which is before us for rehearing en banc, turns on the construction of an indenture dated as of January 1, 1967 (the "Indenture"). The original parties to the Indenture were Collins Radio Company, an Iowa corporation ("Collins"), and The Chase Manhattan Bank (National Association), a national banking association ("Chase"). The Indenture governed the terms of $40,000,000 principal amount of 4⅞% Convertible Subordinated Debentures due January 1, 1987 (the "Debentures"), which were issued by Collins in January 1967. By means of a supplemental indenture executed in May 1970, United States Trust Company of New York, a New York corporation (the "Trust Company"), succeeded Chase as Trustee under the Indenture.

The events that triggered this lawsuit occurred in the fall of 1973, when Rockwell International Corporation, a Delaware corporation ("Rockwell"), acquired Collins in a cash merger. The central question in the case is this: In what form did the conversion rights of the holders of the Debentures survive the merger under the terms of the Indenture?

David Broad brought this class action on behalf of himself and all others who at the time of the merger were holders of the Debentures. He sued Rockwell, Collins, the controlling persons of both,[1] and the Trust Company, alleging that the defendants breached the terms of the Indenture, breached their respective fiduciary duties, and violated various provisions of the federal securities laws. The district court granted a directed verdict in favor of the defendants at the close of Broad's case-in-chief, holding that (1) the defendants' interpretation of the Indenture and their actions in accord with that interpretation were correct and nonactionable as a matter of state law, and (2) for a number of reasons, no reasonable jury could have found violations of the federal securities laws based on the evidence Broad had adduced at trial. A panel of this court affirmed as to the directed verdict on the federal securities counts, but

---

1. The liability Broad would seek to impose on each of these controlling persons appears to be purely derivative in nature. We therefore refer to only the corporate defendants throughout the remainder of the opinion, and our disposition of the claims against the corporate defendants necessarily includes within its scope the claims against the individual defendants.

reversed and remanded on the pendent state-law claims; a majority of the full court, however, vacated the panel's decision under Fifth Circuit Local Rule 17 and ordered that the appeal be reheard en banc. *Broad v. Rockwell International Corp.*, 614 F.2d 418, *vacated and rehearing en banc granted*, 618 F.2d 396 (5th Cir. 1980).

On rehearing en banc, we agree with the panel that the district court acted properly in directing a verdict on the federal securities claims, although we reach that conclusion on narrower grounds than those relied upon by the panel. We disagree, however, with the panel's construction of the Indenture, and hold instead that the district court properly construed that document's provisions. Accordingly, for the reasons set out herein, we affirm the judgment of the district court.

## I. EVENTS LEADING TO THIS APPEAL

### A. The Factual Background to This Litigation

In reviewing the trial court's grant of a directed verdict at the close of Broad's case-in-chief, we use the familiar standard articulated in *Boeing Co. v. Shipman*, 411 F.2d 365 (5th Cir. 1969) (en banc).[2] Viewed in the light most favorable to Broad, the fol-

lowing is a general outline of the relevant facts adduced prior to the directed verdict; more detail is provided as necessary throughout the opinion.[3]

In January 1967, Collins issued and sold to the public $40,000,000 aggregate principal amount of Debentures. The Debentures bore interest at the rate of 4⅞% per year and matured on January 1, 1987, unless sooner redeemed by Collins. They were convertible, at the option of the holders thereof, into the common stock of Collins ("Collins Common Stock"), which had a par value of $1 per share. The Debentures were offered to the public through an underwriting syndicate managed by two New York investment banking firms—Kidder, Peabody & Co. Incorporated and White, Weld & Co.

At the time the Debentures were marketed in 1967, Collins was a prosperous enterprise chiefly engaged in the development and production of radio communications and aircraft navigation equipment. The proceeds of the public offering, like the proceeds of previous offerings of debentures by Collins in the 1960s, were to be used to finance capital additions and to increase working capital for the expansion of Collins' business. During the period immediately before the offering of the Debentures, Collins Common Stock had traded on

---

**2.** We held in *Boeing* as follows:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should

> they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses.

411 F.2d at 374–75 (footnote omitted). *Accord, Dwoskin v. Rollins, Inc.*, 634 F.2d 285, 289 (5th Cir. 1981) (employing this standard in reviewing directed verdict granted on ground that plaintiff had failed to raise a jury question on scienter in suit based on Rule 10b–5). Almost all of the material facts in this case are undisputed, although the parties differ considerably in the legal characterization they would have us place on those facts.

**3.** In our discussion of the facts, we draw to some extent on the language of the panel opinion, 614 F.2d at 422–24.

the New York Stock Exchange for approximately $60 per share. If a holder of Debentures were to choose to exercise his conversion privilege, Collins would issue to him, in exchange for his Debentures, one share of Collins Common Stock for every $72.50 principal amount of Debentures. This meant that conversion might become economically attractive if the market price of Collins Common Stock rose more than $12.50 over its market price of $60 per share at the time of the offering of the Debentures.

Beginning in its 1969 fiscal year, however, Collins suffered a series of economic reversals, manifested by declining sales and reduced income. In the midst of a generally declining stock market, Collins' fading fortunes did not go unnoticed: during the 1971 calendar year, Collins Common Stock never traded on the New York Stock Exchange at more than $21 per share, and in the fourth quarter of that year it was selling for as little as $9.75 per share. Collins was on the verge of bankruptcy. It was at that point, however, that Collins became affiliated with Rockwell.

In August 1971, Collins shareholders overwhelmingly approved the terms of an agreement by which Rockwell invested $35,000,000 in Collins, receiving in return two new series of Collins securities: preferred stock that was convertible into Collins class A common stock, and warrants to purchase additional class A common stock. As sole holder of the new issue of preferred stock, Rockwell also received, and soon exercised, the right to elect a majority of Collins' board of directors. In addition to the $35,000,000 investment, Rockwell provided some managerial assistance to Collins and guaranteed up to $20,000,000 in borrowings by MCI Leasing, Inc., a customer of Collins, so that MCI could order up to $33,000,000 worth of equipment from Collins. Rockwell indicated that while it did not, as of July 1971, purpose that there be a merger between the two companies, it would not rule out the possibility that future events might make such a proposal attractive to it.

By 1973 such a proposal had evidently become attractive. In August of that year, Rockwell made a tender offer for Collins Common Stock, offering the shareholders $25 cash per share tendered. As part of the offer, Rockwell disclosed that if the offer were successful, it intended to propose a merger of Collins into Rockwell at that same figure of $25 per share. The tender offer was successful, and by October 1, 1973, Rockwell had acquired approximately 75% of the outstanding Collins Common Stock.

In accordance with the intentions it had stated prior to the tender offer, Rockwell duly entered into an Agreement and Plan of Merger with Collins dated as of October 8, 1973 (the "Merger Plan"), which provided that on the effective date of the merger, each holder of Collins Common Stock (other than Rockwell itself, of course) would receive $25 per share in cash upon surrender of the certificates evidencing such stock. Under Iowa law (which was applicable because Collins was an Iowa corporation), the approval of a majority of the Collins board of directors and of the holders of two-thirds of the outstanding shares of each class of Collins stock was required for a merger. As a result of the tender offer, Rockwell itself controlled more than two-thirds of the outstanding Collins Common Stock; but it did not hold the 90% needed under Iowa law to effect a "short-form" merger in which no vote of the shareholders would be necessary. As a result, a vote of the Collins shareholders was taken on November 2, 1973, and the Merger Plan was approved by the vote of the holders of approximately 84.5% of the Collins Common Stock. The merger was effected on November 14, 1973, and from that date until the present Collins has operated only as an internal division of Rockwell.

These events, of course, were not without effect upon the Debentures. After they were first offered to the public in 1967, Debentures in the principal amount of $1000 at times traded at almost $60 above face value. Later, however, as Collins' business fortunes diminished and the price of Collins Common Stock slumped dramati-

cally, the market price of the Debentures fell as well. The only class member to testify at trial, William E. Barnes, testified that from 1969 through August 1973 he invested $194,000 in Debentures with an aggregate principal amount of $320,000; though the first Debentures he purchased were selling at well above their principal amount, the Debentures he later purchased were discounted to well below $600 per $1000 principal amount, and his average purchase price for all of his Debentures was about $606 for each $1000 principal amount of Debentures.[4]

The first significant activities of the Trust Company, other than its performance of routine administrative duties as substitute Trustee under the Indenture, came in the fall of 1973 when the Trust Company was called upon to consider whether the terms of a proposed supplemental indenture to be executed by Rockwell, as successor by merger to the obligations of Collins under the Indenture, complied with the terms of the Indenture. Under that supplemental indenture, Rockwell would assume in full all of the obligations of Collins under the Indenture, including the obligation to pay interest, and eventually to repay the principal, on the outstanding Debentures until they either were redeemed or matured in 1987. With regard to the conversion feature of the Debentures, the proposed supplemental indenture provided that each holder of a Debenture would have the right to convert his Debenture into the amount of cash that would have been payable to him under the Merger Plan had he converted his Debenture into Collins Common Stock immediately prior to the merger. In other words, a holder of Debentures could, at any time while his Debentures were outstanding, choose to convert them into exactly that which he would have received had he converted immediately before the merger and participated therein as a holder of Col-

lins Common Stock. Because the holders of Collins Common Stock received no common stock in the merger, the holders of Debentures would have no right to convert into common stock—either of Collins (who would have no more common stock) or of Rockwell—after the merger. Rockwell's view of its post-merger obligations under the Indenture was shared by its counsel (the New York firm of Chadbourne, Parke, Whiteside & Wolff), and by Collins and Collins' counsel (the Los Angeles firm of Gibson, Dunn & Crutcher).

In order to determine whether the proposed terms of the supplemental indenture complied with the terms of the Indenture, the Trust Company engaged the New York law firm of Curtis, Mallet-Prevost, Colt & Mosle. Two partners in that firm—John P. Campbell and John N. Marden—undertook a review of the Indenture and the applicable law. Campbell and Marden took the position in September 1973 that a court might in the future find that the intent of the parties at the time the Indenture was executed was that *the right to convert into common stock would survive a merger of Collins into another company,* and that every holder of Debentures would have the right to convert his Debentures into common stock of the surviving company as long as the Debentures remained outstanding. Since the Indenture required that Rockwell assume all of Collins' obligations under the Indenture in the event of a merger, Campbell and Marden contended that Rockwell would be bound to agree in a supplemental indenture with terms providing for a conversion right of the Debentures into the common stock of Rockwell ("Rockwell Common Stock"), unless Rockwell could obtain the consent of each holder of Debentures that such a right could be extinguished. Furthermore, they contended, Rockwell's voting control of Collins prior to the merger imposed upon Rockwell and the directors of

---

4. Mr. Barnes, a rural mail carrier from Welder, Texas, admitted that in saving Collins from bankruptcy, Rockwell had performed a "verified miracle." He also conceded that as of July 1977, his Debentures were trading at about $775 per $1000 in principal amount, providing him with a net paper profit of more than $50,000 in addition to the roughly $15,000 in interest from the Debentures that he had received. The interest, of course, was paid on the face value of the Debentures rather than on their discounted market value.

Collins a fiduciary obligation to the holders of Debentures.

The record indicates that discussions and exchanges of memoranda and drafts of opinions between counsel for Rockwell and Collins on the one hand, and counsel for the Trust Company on the other hand, continued for several weeks, and their disagreement was heated. There is also evidence in the record indicating that Rockwell exerted considerable pressure on the Trust Company to change its position, threatening the withdrawal of certain other business from the Trust Company and possible litigation if the Trust Company blocked the merger by refusing to execute a supplemental indenture. At something of an impasse with counsel for Rockwell, Campbell advised the Trust Company on September 18, 1973, that it could follow any of four alternative courses of action: (1) the Trust Company could decline to execute a supplemental indenture (thus blocking the Collins-Rockwell merger) unless the supplemental indenture provided for a right to convert into Rockwell Common Stock; (2) the Trust Company, as a policy decision, could refuse to take a position as to the rights of the holders of the Debentures after the merger, relying on the provisions in the Indenture and in the supplemental indenture by which Rockwell would indemnify the Trust Company from liability in any lawsuits that might later be brought; (3) the Trust Company could resign as Trustee under the Indenture; or (4) the Trust Company could seek a declaratory judgment with respect to the conversion rights of the holders of Debentures after the merger. Campbell recommended alternative (2), and the Trust Company ultimately followed that recommendation.

Thus, on October 11, 1973, Rockwell sent a letter to the holders of the Debentures to notify them of the proposed merger between Rockwell and Collins. The text of the letter read as follows:

Rockwell International Corporation ("Rockwell") has proposed the merger of Collins Radio Company ("Collins") into Rockwell. Pursuant to the terms of the proposed merger Rockwell would assume all of Collins obligations, including Collins obligations under the Indenture, dated as of January 1, 1967, relating to Collins 4⅞% Convertible Subordinated Debentures due January 1, 1987 (respectively the "Indenture" and the "Debentures").

Rockwell and United States Trust Company of New York, the Successor Trustee under the Indenture (the "Trustee"), intend to execute a Supplemental Indenture to the Indenture on or about November 1, 1973. This Supplemental Indenture is to be effective on the effective date of the merger of Collins into Rockwell and will provide for the assumption by Rockwell of the due and punctual payment of the principal of and interest on the Debentures and the due and punctual performance and observance by Rockwell of all the terms, covenants and conditions of the Indenture. *The Supplemental Indenture does not alter or impair the rights accorded under the Indenture to holders of the Debentures and does not change the provisions of the Indenture.*

With regard to the conversion rights of holders of the Debentures, counsel for Rockwell and counsel for Collins have each advised that *under Section 4.11 of the Indenture*, the Section that provides for the adjustment of conversion rights upon a merger or similar event, *a holder of a Debenture, upon effectiveness of the proposed merger, would have the right, until the expiration of the conversion right of such Debenture, to convert the Debenture into the amount of cash that would have been payable with respect to the number of shares of Collins Common Stock into which the Debenture could have been converted immediately prior to effectiveness of the proposed merger.* The current conversion price of $72.50 entitles the holder of a $1,000 Debenture to convert it into 13.79 shares of Collins Common Stock. Pursuant to the merger each share of Collins Common Stock outstanding immediately prior to the merger (other than those held by Rockwell) is to be converted into $25. *Thus, after the merger, a $1,000 Debenture will be convertible into $344.75 in cash.*

*The Trustee has advised that it does not take a position with regard to this letter or the statements herein,* and that it has consulted with its counsel who confirmed that as Trustee it should not take a position with regard thereto.

Neither the proposed merger nor the proposed Supplemental Indenture requires action by the Debentureholders. Upon effectiveness of the merger, the Debentures will represent indebtedness of Rockwell. *You will not need to surrender or exchange your Debentures for new debentures.*

(Emphasis added.) The letter was signed by both the president and the chairman of the board of Rockwell.[5]

According to Campbell's testimony by deposition, at some point prior to the merger he abandoned his interpretation of the Indenture in favor of the interpretation advanced by counsel for Rockwell and Collins. When asked to explain why he had abandoned his earlier position, Campbell answered as follows:

It started out with a premise that we must find law to support the position which [Broad] now assert[s]. I made, I thought, a very good try and had almost convinced myself by starting with the conclusion and working back to get the authority. It was a good dog, but it wouldn't hunt. I fell down.

Other evidence in the record, however, indicates that as late as January 1974, Campbell continued to see some validity in his earlier view.

Nonetheless, on November 14, 1973, the merger was effected, and a supplemental indenture between Rockwell and the Trust Company was executed, effective as of November 1, 1973. The supplemental indenture provided that Rockwell would assume Collins' obligations on the Debentures. Specifically, it provided that after the merger, the holders of the Debentures had the right to convert the debentures into that which they would have received in the Merger Plan had they converted immediately before the merger's effective date. In accordance with the October 11 letter, Rockwell has consistently interpreted this to mean that the Debentures could be converted into cash, but not into the common stock of either Rockwell or Collins; the conversion rate was $344.75 in cash for each $1000 in principal amount of Debentures surrendered.

## B. Action in the District Court

Plaintiff David Broad, a holder of Debentures at the time of the merger, filed this class action in federal court against Rockwell, Collins, the controlling persons of both, and the Trust Company. Broad alleged two claims under the federal securities laws—specifically, under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and under Rule 10b–5 promulgated by the Securities and Exchange Commission thereunder, 17 C.F.R. § 240.10b–5 (1980).[6] His two federal claims were, as a logical matter, urged essentially in the alternative. His main claim

---

**5.** This letter touched off a wave of inquiries by holders of Debentures about the status of their conversion rights. Some apparently were of the impression that Rockwell's October 11 letter did not foreclose the possibility that the Debentures would be convertible at the holders' option into either cash or Rockwell Common Stock. Others contended that Rockwell could not "eliminate" their right to convert into Collins Common Stock without paying them new consideration or providing a conversion right into Rockwell Common Stock. Many holders of Debentures requested copies of the Indenture, which were provided. Some requested copies of the opinions from the respective counsel for Rockwell, Collins, and the Trust Company, but those requests were refused. The Trust Company did, however, initially indicate to a number of holders of Debentures that it disagreed with Rockwell's interpretation of the Indenture without indicating to Rockwell that it was doing so. When Rockwell accused the Trust Company of "fomenting litigation," Campbell replied that the Trust Company had withheld from Rockwell its answers to the letters on the basis of his advice as to the Trust Company's fiduciary obligation to represent the holders of debentures.

**6.** These claims were within the district court's subject-matter jurisdiction under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa (1976), and under 28 U.S.C. §§ 1331 and 1337 (1976).

was that the defendants had collectively engaged in a fraudulent scheme to deny the holders of debentures their rights under the Indenture to convert into common stock at any time until the Debentures matured in 1987 or were sooner redeemed. In the alternative, he claimed that at the time the debentures were issued in 1967, the defendants had omitted to disclose a material fact with regard to the terms of the Debentures —specifically, that under the terms of the Indenture, the right to convert into Collins Common Stock could, in the event of a merger, be replaced with the right to convert into only that which the holders of Collins Common Stock received in the merger.[7]

Broad also alleged a number of pendent state-law claims.[8] Essentially, these claims were that all the defendants had breached the Indenture; that all the defendants had breached the covenant of good faith and fair dealing implied into the Indenture by law; that Rockwell had breached a fiduciary duty which it owed the holders of the Debentures by virtue of its control of both parties to the 1973 merger; and that the Trust Company had breached its fiduciary duty as Trustee for the holders of the debentures. The argument that the defendants had breached the Indenture was also urged in the alternative: Broad first contended that the Indenture unambiguously provided for a right to convert into common stock that would survive any merger. But if not unambiguously susceptible to the interpretation he urged in his first argument, Broad contended that the Indenture was at the least ambiguous, and that the intent of the parties at the time the Indenture was executed was that the right to convert into common stock would survive any merger.

Broad sought three alternative forms of relief for the class: (1) "restoration" of the option to convert into Rockwell Common Stock (since no Collins Common Stock exist-

ed after the merger); (2) a judgment for the difference between the redemption price (103¼% of principal amount) and the market value of the Debentures as of the date of judgment, with interest from the date of the merger; or (3) redemption at 103¼% of the principal amount of the Debentures.

At the close of Broad's case-in-chief on the third day of trial, the district court granted the defendants' motions for a directed verdict on all of these claims. With regard to the claim that the defendants omitted to disclose a material fact in connection with the issuance of the Debentures in 1967 and subsequent to that time, the court held that the record was devoid of evidence from which reasonable persons could find that any defendant acted with scienter, even if recklessness were sufficient to satisfy the scienter requirement under Rule 10b–5. Additionally, the court held that the Trust Company had no duty to disclose this allegedly omitted fact since it had no connection with the Debentures until 1970. With regard to the claim that the defendants had schemed to deprive the holders of the Debentures of their conversion rights, the court held that any of three grounds justified the directed verdict: first, there was no evidence from which reasonable men could find that the defendants acted with scienter, even if reckless conduct were sufficient to satisfy the scienter requirement; second, Rockwell correctly construed the Indenture in 1973 and fully respected the rights of the holders of the Debentures in the merger; and last, the wrongs alleged in this claim did not occur in connection with a purchase or sale of a security, since the holders of the Debentures still held their Debentures after the merger.

With regard to the state-law claims, the court held that even if Broad's claim that the Indenture was ambiguous had been

---

7. Broad has from time to time resisted the characterization of his Rule 10b–5 claims as being in the alternative, but we see no way in which they can logically be reconciled.

8. These claims were within the district court's subject-matter jurisdiction under the pendent jurisdiction doctrine of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

timely made,[9] that argument was unfounded: the Indenture was unambiguous, and its terms were as Rockwell contended. The court held that its ruling on this question of law foreclosed Broad's breach of contract claim, since it was undisputed that Rockwell's conduct was in full compliance with the court's interpretation of the Indenture. The court further held that Rockwell's compliance with the Indenture also foreclosed any breach of fiduciary duty claims, and that the record was devoid of evidence from which reasonable persons could conclude that Rockwell acted with bad motives. As to the Trust Company, the court held that it had only those duties specified in the Indenture and in the Trust Indenture Act of 1939 (the "Trust Indenture Act"), 15 U.S.C. §§ 77aaa–77bbbb (1976), and that it had not breached any of those duties.

As an alternate ground for the directed verdict on all counts, the court held that the record was devoid of evidence from which reasonable persons could find actual damages, and that none of the equitable remedies requested by Broad would have been appropriate even if he had prevailed on one or more of his theories of liability.

## C. The Panel Opinion

On appeal, a panel of this court affirmed the directed verdict on the federal securities claims, but reversed and remanded on the state-law claims. With regard to the Rule 10b–5 claim that the defendants had omitted to disclose in 1967 and thereafter until the merger the possibility that the right to convert into common stock would be altered in the event of a merger, the panel agreed with the district court that there was no evidence in the record from which reasonable persons could find that any of the defendants had acted with scienter. 614 F.2d at 439–41. With regard to the Rule 10b–5 claim that in 1973 the defendants had engaged in a fraudulent scheme to deprive the

holders of the Debentures of their rights to convert into Collins Common Stock, the panel agreed with the district court that as regards the holders of the Debentures there had been no "purchase or sale" of a security, rejecting Broad's argument that the loss of the conversion right was analogous to a constructive or forced sale. *Id.* at 435–39. Having agreed with the district court that there could be no liability on the federal securities claims, the panel declined to discuss the district court's alternative ground for the directed verdict on those claims— that the record was devoid of evidence from which reasonable persons could find actual damages. *Id.* at 439 n.24.

The panel parted ways with the district court on the question of the Indenture's ambiguity, however, holding that the Indenture was ambiguous as a matter of law because it did not speak "with the requisite clarity" to the post-merger conversion rights of the holders of the Debentures. That being the case, the panel held that the jury should have been allowed to determine whether Rockwell and the Trust Company had acted in accord with the intent of the parties at the time the Indenture was executed. *Id.* at 426–29. Further, since under New York law every contract contains an implied covenant of fair dealing, the panel held that the jury should have been allowed to determine whether the defendants had dealt fairly with the holders of the Debentures. *Id.* at 429–30.

With regard to the fiduciary duty claims, the panel held that Rockwell's duties to the holders of the Debentures should be considered to have been met if on remand the jury were to find either (1) that Rockwell complied with the intent of the parties at the time of the execution of the Indenture, or (2) that despite its breach of the Indenture, Rockwell acted in good faith based on a reasonable understanding of the Indenture. *Id.* at 430–31. As to the Trust Com-

---

9. The claim that the Indenture was ambiguous was actually not included in Broad's complaint, and neither did it appear in the summary of the parties' contentions that was filed in lieu of a pretrial order. Nonetheless, since the district court did not specifically hold that such an

argument had been waived, but instead reached the merits of the ambiguity argument, and since the panel opinion has reviewed the district court's ruling on that argument, we too will include it in our discussion of the case.

pany's fiduciary duty, the panel held that the Trust Indenture Act imposed no fiduciary obligations in addition to those imposed by applicable state law. *Id.* at 431–32. Returning to state law, the panel held that the Trust Company was cloaked with a fiduciary duty to the holders of the Debentures under New York law, and that it was for the jury to decide whether the Trust Company had violated that duty. *Id.* at 432.

On the question of the measure of damages applicable to the state-law claims, the panel agreed with the district court that equitable relief such as redemption of the Debentures or restoration of the common stock conversion privileges would be inappropriate. But the panel held that if on remand the jury found that the defendants had breached the Indenture, the district court could apply the default provisions set out in the Indenture, which provided that the principal and accrued interest on the Debentures would be accelerated to be due and payable immediately as of the time of the default. *Id.* at 433.

## II. CONSTRUING THE INDENTURE

### A. The Nature of the Contract

Because the construction of the Indenture is basically a question of contract law, it is perhaps worthwhile to discuss briefly the way in which this type of contract operates, and the reasons why such contracts must be so long and detailed. Convertible debentures represent one of many means through which business enterprises obtain capital from investors for long periods of time. Most such means can be classified as either "debt securities" or "equity securities," but convertible debentures are something of a hybrid—basically a debt security, but with equity features.

In part because of the differing treatment of debt and equity securities both by statute and at common law, debt securities are, to a much larger degree than is true of equity securities, creatures of contract law.[10] As a result, the written contracts that govern the rights and obligations of

10. The American Bar Foundation's *Commentaries on Indentures* make the following comments on the distinctions between long-term debt financing and equity financing:

In general, funds needed for financing private corporate enterprises are obtained in exchange for interests of two essentially different kinds: (1) those of the "equity" owners or shareholders, whose securities represent certain rights of ownership, control and profit accompanied by a relatively greater risk of loss, and (2) those of the "lenders," who classically forego control and profit in return for periodic payments (interest and often sinking fund) without regard to profits and for repayment of principal at a fixed date, ahead of the equity owners.

The most obvious and important characteristic of long-term debt financing is that the holder ordinarily has not bargained for and does not expect any substantial gain in the value of the security to compensate for the risk of loss. This is not true of a debt security which is convertible into an equity security, and it is not entirely true of a debt security purchased for much less than its principal amount. With these exceptions, however, the significant fact, which accounts in part for the detailed protective provisions of the typical long-term debt financing instrument, is that the lender (the purchaser of the debt security) can expect only interest at the prescribed rate plus the eventual return of the principal. Except for possible increases in the market value of the debt security because of changes in interest rates, the debt security will seldom be worth more than the lender paid for it, provided he bought it at approximately its face amount. It may, of course, become worth much less. Accordingly, the typical investor in a long-term debt security is primarily interested in every reasonable assurance that the principal and interest will be paid when due.

The second fundamental characteristic of long-term debt financing is that *the rights of the holders of the debt securities are largely a matter of contract*. There is no governing body of statutory or common law that protects the holder of unsecured debt securities against harmful acts by the debtor except in the most extreme situations. Short of bankruptcy, the debt security holder can do nothing to protect himself against actions of the borrower which jeopardize its ability to pay the debt unless he takes a mortgage or other collateral or establishes his rights through contractual provisions set forth in the debt agreement or indenture.

Finally the long-term debt may be held by many holders, all of whom expect to be treated on a parity. Here, again, there is no body of law governing the procedures by which the holders of debt securities may take collective action. These procedures, as well as the mechanics of transfer and exchange of the securities, are matters of contract which

debt securities are often long and complex, for those contracts attempt to anticipate and deal with in advance all possible contingencies that might call into question the operation of those rights and obligations. In the case of debentures, those contractual rights are set forth in a document that is separate from the debt instrument itself. That document, whose terms are incorporated by reference on the face of the debt instrument, is commonly called an indenture.[11]

The debt represented by the debenture is typically not secured by specific assets of the issuer,[12] and is frequently subordinated to senior indebtedness of the issuer. It is usually the case that the debentures of a given issue are held by a great number of parties, and for this reason it was found desirable, as the modern concept of debentures developed, that the indenture designate a corporate trustee to protect the rights of the many holders of the debentures and to perform certain ministerial tasks connected with the normal operation of the debentures. Thus, although the debts created by the debentures run directly from the issuer to the holders, the contractual rights conferred by the indenture run from the issuer to the trustee for the benefit of the holders of the debentures.[13] In today's usage, then, a security is general-

are usually set out in the indenture and sometimes in the debt instrument. Thus the situation is quite unlike that involved in the issuance of stock where various substantive rights and procedural matters are in effect incorporated in the certificate of incorporation of the issuer by operation of the applicable corporation laws.
American Bar Foundation, Commentaries on Indentures 1–2 (1971) (emphasis added).

11. The modern form of debenture indenture was originally adapted from a different form of negotiable security:

The first debt securities termed "debentures" did not involve a trustee. They were, in effect, promissory notes issued in quantity with no underlying indenture or comparable agreement. *Prior to World War I, draftsmen were challenged with the task of creating debentures as to which all holders would be on a parity and protected by adequate covenants and which would nevertheless be negotiable. The solution was to take the corporate mortgage indenture form, delete the con-veyancing and other provisions relating to the collateral, and insert covenants designed to protect the debentureholders. These protective covenants were designed to prevent the borrower from placing other creditors in a position senior to the debentureholders, indulging in excessive borrowing or otherwise jeopardizing its ability to meet the obligations on the debentures. Other provisions of an administrative nature remained much the same in a debenture indenture as those in a mortgage indenture. The result is a form of instrument which offers great flexibility for adaption to a particular transaction.
*Id.* at 7 (footnote omitted).

12. This feature distinguishes debentures from corporate bonds:

There is no inherent or clearly established distinction between "bonds" and "debentures." . . . The terms "bond" and "deben-

ture" came into use in the United States without any definite or consistent legal connotation and to some extent are still intermingled. Financial men refer to the "bond market" as including all forms of long-term debt securities. . . . [Under preferred usage], *"debenture" means a long-term debt security which is not secured,* and "bond" (except with respect to governmental or other public corporation securities) means a long-term debt security which is secured by a lien on some or all of the assets of the borrower. Most recent issues conform to this usage.
*Id.* at 7 n.3 (emphasis added). Debentures are also distinguishable from long-term notes:

There is no basic or historically established distinction between "debentures" and "notes." There has emerged, however, a clear and useful distinction in modern usage. According to this usage, in the area of long-term debt securities, a security is properly termed a "note" when it is not issued pursuant to an indenture and there is no indenture trustee. However, it may be, and usually is, issued to one or a few purchasers pursuant to a purchase or loan agreement which, in addition to provisions dealing with the terms of purchase, includes many of the contractual rights found in an indenture. In today's nomenclature *the security is properly termed a "debenture" when it is issued pursuant to an indenture and there is an indenture trustee.*
*Id.* at 8 (emphasis added). These distinctions are, of course, merely generalizations; as such, they do not hold true in all cases. For example, long-term notes may be issued pursuant to an indenture, but *without a trustee because they are to be purchased by a comparatively small number of institutional investors.*

13. The function of the trustee is explained by the historical context through which debentures developed:

Even though the debenture indenture creates no lien, it was found desirable to retain

ly termed a "debenture" when it is a long-term unsecured debt security, issued pursuant to an indenture and with an indenture trustee.

Not all debentures are "straight debt securities." The Debentures at issue in this case are examples of "convertible debentures," which exhibit characteristics of both debt and equity securities:

A convertible debenture is one which gives the holder the right to exchange his debenture for other securities of the [issuing] Company, usually for shares of common stock and usually without payment of further consideration. The conversion right, although set forth in the debenture and in the indenture, is separate and distinct from the debt evidenced by the debenture. As a separate right it has its own ascertainable value.

American Bar Foundation, Commentaries on Indentures 522–23 (1971) (footnotes omitted) (hereinafter cited as *Commentaries*). The fact that a debenture is convertible into equity securities is an important feature, and therefore the terms under which the debenture may be converted are usually summarized on the face of the debenture itself. All convertible debentures, however, purport only to *summarize* the salient provisions of the conversion terms on the face of the instrument; as is the case with the other complicated provisions that govern the duties of the issuer and trustee, the terms of redemption, and so forth, many of the details concerning the debenture's convertibility must be set forth instead in the governing indenture.

The indenture will specify a rate at which the debentures can be converted into equity securities (usually common stock). This is often expressed in terms of a "conversion price," which may be conceptualized as the price at which a share of stock may be "purchased" by the holder of the debenture in exchange for the surrender of indebtedness under the debenture. For example, if the conversion price for a debenture in the principal amount of $1000 is $50, the holder of the debenture is entitled to convert his $1000 debenture into a total of 20 shares of common stock.

The discussion above only briefly describes the manner in which convertible debentures function. Given this,

it is not surprising that corporate indentures are lengthy and complex. There is much that much be covered by the contract set forth in the indenture. But it is also true that much of what has to be covered is, or could be, virtually the same for all indentures. These are the provisions that are commonly referred to as "boiler-plate," e. g., provisions regulating the issuance, authentication, transfer and exchange of securities; provisions establishing the procedures for collective action by the securityholders; and provisions prescribing the duties of the trustee. These, and certain others, are provisions which have been stated in many different ways in various indentures. Since there is seldom any difference in the intended meaning, such provisions are susceptible of standardized expression. The use of standardized language can result in a bet-

---

the trustee. In fact, since 1939 a trustee has been required by the Trust Indenture Act for issues subject to registration under the Securities Act of 1933. The fact that the debenture indenture trustee does not hold title to, or have possession of, any property has caused some persons to regard its position as an anomaly and the title "trustee" a misnomer. As a matter of law, however, it is well established that the corpus of a trust may consist of contractual rights and that one who holds contractual rights for the benefit of others may be a trustee. Accordingly, the title "trustee" is appropriate in this situation because, although the debts created by the debentures run directly from the issuer to the

holders, the contractual rights conferred by the indenture run from the issuer to the trustee for the benefit of the holders.

Apart from legal semantics, the role performed by the debenture identure trustee is a practical necessity whenever there are any substantial number of holders of the debt securities. Some of the most useful functions customarily performed by the trustee are not performed in its capacity as trustee, but rather as transfer agent and paying agent. Nevertheless, the protection to debentureholders accorded by the pure trustee functions is of significant value. *Id.* at 7–8.

ter and quicker understanding of those provisions and a substantial saving of time not only for the draftsmen but also for the parties and all others who must comply with or refer to the indenture, including governmental bodies whose approval of authorization or the issuance of the securities is required by law.

*Commentaries* at 3. Not least among the parties "who must comply with or refer to the indenture" are the members of the investing public and their investment advisors. A large degree of uniformity in the language of debenture indentures is essential to the effective functioning of the financial markets: uniformity of the indentures that govern competing debenture issues is what makes it possible meaningfully to compare one debenture issue with another, focusing only on the business provisions of the issue (such as the interest rate, the maturity date, the redemption and sinking fund provisions and the conversion rate) and the economic conditions of the issuer, without being misled by peculiarities in the underlying instruments.

### B. Conversion Rights at Common Law and the Need for Contractual Antidilution Provisions

In the case at bar, there are specific portions of the Indenture that set out the rights of the holders of the Debentures, and the obligations of the Trustee and issuer, in the event that the issuer is merged into another company. Nonetheless, the common law's treatment of conversion rights upon merger is important in this case in two different respects. First, it must be determined whether the common law provides the holders of the Debentures with rights in addition to the rights that are set out in the Indenture. Second, an understanding of the common law's treatment of conversion rights upon merger explains the historical development of boilerplate contractual antidilution provisions of the sort found in the Indenture.

The *Commentaries* explain in brief the possible dangers to the conversion rights of the holders of debentures that might attend certain actions by the issuer of the debentures:

The anti-dilution provisions are designed to preserve the value of the conversion privilege against diminution by certain voluntary corporate acts. For example, if the conversion price is $25 a share at a time when the common stock has a market value of $30 a share, the conversion right is clearly valuable. If the Company should then split its stock 3 for 1, the market price of its shares would be reduced to approximately $10 per share. Thus the value of the right to convert at $25 per share would have been virtually destroyed, by that voluntary corporate action, in the absence of appropriate protective provisions.

Inasmuch as ownership of a convertible debenture does not give the holder the rights of a shareholder, the holder of a convertible debenture would have almost no protection against acts by the Company which would adversely affect the value of the common stock issuable on conversion, such as a split-up of shares, stock dividends, distribution of assets, issuance or sale of other convertible securities, issuance of options, issuance or sale of common stock at prices below the current conversion or market price, *merger*, sale of assets or dissolution and liquidation of the Company. Events of this type are customarily described as "diluting" the value of the conversion privilege, and *if protection is desired against such dilution, appropriate provisions must be included in the indenture.*

*Commentaries* at 527 (1971) (emphasis added; footnote omitted). As justification for the phrase we have italicized above, the *Commentaries* cite *Parkinson v. West End Street Railway Co.*, 173 Mass. 446, 53 N.E. 891 (1899) (per Holmes, J.).

Justice Holmes' decision in *Parkinson* was aptly cited by the authors of the *Commentaries* for the proposition that antidilution protection must be provided by contract if it is to be provided at all, for *Parkinson* holds that there is no such protection at common law. The plaintiff in *Parkinson* held Highland Street Railway bonds that

were convertible into Highland's preferred stock. When West End Street Railway acquired Highland "subject to all [of Highland's] duties, restrictions, and liabilities," *id.* at 447, 53 N.E. at 891, the existing holders of Highland's preferred stock received West End preferred stock or preemptive rights thereto in exchange for their Highland stock. West End refused, however, to convert the Highland bonds into West End preferred stock. The Massachusetts Supreme Court denied relief:

> [T]he contract does not prevent the corporation from consolidating with another in such a way as to make performance impossible, any more than it prevents the issue of new stock in such a way as to make performance valueless.... A consolidation which makes no arrangement for furnishing stock in the new company, and which ends the existence of the old ones, as a general rule may be presumed to put an end to the right of bondholders to call for stock, not because the law has not machinery for keeping such a right alive, but because, not being bound to do so, it has made dispositions which manifestly take no account of it.

*Id.* at 448–49, 53 N.E. at 892. Thus, according to *Parkinson*, mergers may extinguish all conversion rights, absent explicit contractual provisions to the contrary.[14] The same idea is expressed in *Lisman v. Milwaukee, Lake Shore & Western Railway Co.*, 161 F. 472 (C.C.E.D.Wis.1908), aff'd

*mem.*, 170 F. 1020 (7th Cir.), *cert. denied*, 214 U.S. 520, 29 S.Ct. 700, 53 L.Ed. 1065 (1909):

> [I]t would appear that the [issuer] might, in the interest of its stockholders, go out of existence without giving the holder of a convertible bond any just cause of complaint.
>
> ... In the sale and purchase both railway companies were acting within their strict legal rights to promote the interests of their respective stockholders. This change of ownership was only one of several vicissitudes liable to happen during 20 years in the life of the corporation, which might render the outstanding option valueless, and still afford no cause of action to the debenture holder. Nothing has taken place which the debenture holders were not bound to anticipate.... If [as a result of the consolidation] the hope of speculative venture on the stock market was extinguished, it is damnum absque injuria.

*Id.* at 477–78.[15]

Broad has cited no persuasive authority which would indicate that the common law of New York or of any other jurisdiction would provide any additional protection for his conversion rights upon merger, other than that protection which might be included in the Indenture.[16] But the common law cases cited by the parties do shed light on the origin of and need for boilerplate antidilution provisions of the sort at issue here.

---

14. As Justice Holmes indicated in *Parkinson*, 173 Mass. at 449, 53 N.E. at 892, his two previous opinions in *John Hancock Mutual Life Ins. Co. v. Worcester, Nashua & Rochester Railroad Co.*, 149 Mass. 214, 21 N.E. 364 (1889), and *Day v. Worcester, Nashua & Rochester Railroad Co.*, 151 Mass. 302, 23 N.E. 824 (1890), were not inconsistent with the general principle announced in *Parkinson*, but were instead exceptions to that principle based on peculiar facts, none of which are present in the case at bar.

15. *See also Kessler v. General Cable Corp.*, 92 Cal.App.3d 531, 539–40, 155 Cal.Rptr. 94, 99–100 (1979); H. Henn, The Law of Corporations 288–89 & n.32 (2d ed. 1970), and sources cited therein. *Cf. Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194, 200–01, 62 S.Ct. 546, 550–51, 86 L.Ed. 789 (1942) (citing *Parkinson* with approval for the propositions that war-

rantholders' rights are wholly contractual, and that those contractual rights may expire upon consolidation of obligor corporation with another company, in deciding whether warrants exercisable into common stock constituted "voting stock" within the meaning of federal statute providing for tax-free reorganizations); *Welles v. Chicago & Northwestern Railway Co.*, 175 F. 562, 563–64 (2d Cir. 1910) (per curiam) (while option to convert could be exercised within 10 days of payment of common stock dividend, after consolidation neither common stock nor dividend existed and hence option could not be exercised).

16. We leave aside for the moment the question of whether Broad can claim such protection from an implied covenant of fair dealing, as suggested by the panel opinion, 614 F.2d at 429-30. We deal with this issue in part III–A of this opinion, *infra*.

As the *Lisman* case points out, holders of debentures were charged at common law with the knowledge that various voluntary corporate actions might dilute—or even render nugatory—the value of their debentures' conversion feature; because dilution was (at least constructively) within their contemplation when they purchased the security, there was no unfairness in denying the holders of debentures any compensation in the event of such dilution. But of course, even before the occurrence of a diluting event, this *risk* of dilution itself significantly diminished the value of the conversion feature. As Justice Holmes noted in *Parkinson*, however, the law does have machinery through which, if the parties so choose, the value of the conversion right may be protected. The draftsmen of indentures may guard against dilution through the insertion of any of three types of special contractual provisions.

The first and most drastic type of provision is the outright prohibition of certain types of voluntary corporate conduct. Such prohibitory covenants are more typically used to protect the value of the debt obligation represented by the debenture.[17] But prohibitory covenants may also be used to protect the value of the conversion feature—*e. g.*, by means of an absolute ban on mergers. The efficacy of this means of antidilution protection must be balanced against the loss of business flexibility it means for the issuer. Some sorts of corporate conduct can be limited with little loss of flexibility, but other restrictions may so hamstring the company that they threaten its continued existence.

Happily, there are two less restrictive means of antidilution protection that do not bear such high costs in terms of business flexibility, as the following excerpt from the *Commentaries* indicates:

In modern convertible debenture indentures it is virtually universal to provide some anti-dilution protection [that provides for the adjustment of the conversion price upon the taking of specific actions by the issuer that would cause the value of the conversion right to be diluted], usually in combination with provisions [requiring advance notice to the debentureholders of such acts], plus a provision for equitable adjustment in the event of a merger or other reorganization [in which the issuer is the surviving company]. However, *adjustment of the conversion price by itself cannot provide the debentureholder with protection against all events which might substantially affect the conversion privilege.* For example, when the Company is to be *merged* into another corporation and the Company's common stock is to be replaced by convertible preferred stock or debentures of the surviving corporation, adjustment of the conversion price would not provide adequate protection. *Thus it is now customary to provide that the debentureholder will be given the right to convert his debentures into whatever securities are to replace the common stock of the Company.*

*Commentaries* at 528 (emphasis added).[18] Professor and former SEC Chairman Cary makes the same point:

As a consequence of cases such as *Parkinson*, it has been found necessary in the conversion contract to provide for protection in the event of consolidations, mergers, conveyance of substantially all assets, capital reorganizations and reclassifications. If any of these occur the instrument frequently provides that the holder of the convertible security shall have the right thereafter to convert it "into the kind and amount of shares of stock and

17. For example, the issuer may be prohibited from exceeding negotiated limits on the funded (long-term) debt it incurs. This preserves a margin of safety for the holders of debentures by "preventing a dilution of the debentureholders position and a weakening of the Company's financial structure through the creation of what is considered in the particular case to be an excessive amount of additional debt." *Commentaries* at 370.

18. Although the quoted text refers only to providing a right to convert into the *securities* of the surviving company, the actual antidilution provision suggested in the *Commentaries* is of broader scope. See note 19, *infra*.

other securities and property receivable ... by a holder of the number of shares of capital stock into which such [convertible security] might have been converted immediately prior to such reclassification, change, consolidation, merger, sale, or conveyance."

W. Cary & M. Eisenberg, Cases and Materials on Corporations 1155 (5th ed. unabr. 1980) (elipsis and bracketed portion in original). The *Commentaries* contain a suggested antidilution provision with strikingly similar language to that set out in the above passage.[19]

While the common law's treatment of conversion rights in the event of merger provides a useful background, and while various antidilution provisions promulgated by the American Bar Foundation and the commentators are useful for purposes of comparison, the resolution of this case ultimately turns upon our construction of the specific language in the Indenture under which the Debentures were issued in 1967.

### C. The Applicable Rules of Construction

Though the parties are residents of many different states, and though the events with which we are concerned are national in scope, there is no dispute over which state's law governs in construing the contract. Section 17.12 of the Indenture provides in pertinent part as follows:

> This Indenture and each and every provision hereof and of the Debentures shall be deemed to be a contract made under the laws of the State of New York, and

for all purposes shall be construed in accordance with the laws of said State. Thus, we will apply settled principles of New York law in construing the Indenture—although those principles of contract construction are very nearly universal throughout the United States.

█ The process of contract interpretation is the means through which the scope of the parties' agreement and their respective rights thereunder are determined. Under New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed. *Breed v. Insurance Co. of North America,* 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978). Due consideration must be given to the purpose of the parties in making the contract, and a fair and reasonable interpretation consistent with that purpose must guide the courts in enforcing the agreement. *Cromwell Towers Redevelopment Co. v. City of Yonkers,* 41 N.Y.2d 1, 6, 359 N.E.2d 333, 337, 390 N.Y.S.2d 822, 826 (1976); *Pittsburg Coke & Chemical Co. v. Bollo,* 421 F.Supp. 908, 928 (E.D.N.Y.1976) (applying New York law), *aff'd,* 560 F.2d 1089 (2d Cir. 1977).

█ The interpretation of an unambiguous contract provision is a function for the court rather than for a jury, and matters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument. *Teitelbaum Holdings, Ltd. v. Gold,* 48 N.Y.2d 51, 56, 396 N.E.2d 1029, 1032, 421

---

**19.** The sample provision in the *Commentaries* reads as follows:

> If any capital reorganization or reclassification of the capital stock of the Company, or consolidation or merger of the Company with another corporation, or the sale of all or substantially all of its assets to another corporation, shall be effected in such a way that holders of Common Stock shall be entitled to receive stock, securities or assets with respect to or in exchange for Common Stock, then, as a condition of such reorganization, reclassification, consolidation, merger or sale, the Company or such successor or purchasing corporation, as the case may be, shall execute with the Trustee a supplemental indenture providing that the Holder of

each Debenture then Outstanding shall have the right thereafter and until the expiration of the period of convertibility to convert such Debenture into the kind and amount of stock, securities or assets receivable upon such reorganization, reclassification, consolidation, merger or sale by a holder of the number of shares of Common Stock into which such Debenture might have been converted immediately prior to such reorganization, reclassification, consolidation, merger or sale, subject to adjustments which shall be as nearly equivalent as may be practicable to the adjustments provided for in this Article Thirteen.

*Commentaries* at 549–50.

N.Y.S.2d 556, 559 (1979); *West, Weir & Bartel, Inc. v. Mary Carter Paint Co.*, 25 N.Y.2d 535, 540, 255 N.E.2d 709, 711–12, 307 N.Y.S.2d 449, 452 (1969); *Mendel-Mesick-Cohen-Architects v. Peerless Insurance Co.*, 74 A.D.2d 712, 713, 426 N.Y.S.2d 124, 126 (3d Dep't 1980).

A court may not rewrite a term of a contract by "interpretation" when that term is clear and unambiguous on its face. *Fiore v. Fiore*, 46 N.Y.2d 971, 973, 389 N.E.2d 138, 139, 415 N.Y.S.2d 826, 826 (1979); *Rodolitz v. Neptune Paper Products, Inc.*, 22 N.Y.2d 383, 386–87, 239 N.E.2d 628, 630, 292 N.Y.S.2d 878, 881 (1968). In interpreting the contract, a court must be concerned with what the parties intended, but only to the extent that they evidenced what they intended by what they wrote. *Rodolitz*, 22 N.Y.2d at 386–87, 239 N.E.2d at 631, 292 N.Y.S.2d at 881. Neither may a court rewrite a contract to accord with its instinct for the dispensation of equity under the facts of a case. *DeVanzo v. Newark Insurance Co.*, 44 A.D.2d 39, 43, 353 N.Y. S.2d 29, 32 (2d Dep't 1974), *aff'd*, 37 N.Y.2d 733, 337 N.E.2d 131, 374 N.Y.S.2d 619 (1975).

Finally, under New York law, the entire contract must be considered, and, as between possible interpretations of an allegedly ambiguous term, that will be chosen which best accords with the sense of the remainder of the contract, and that interpretation is favored which will make every part of the contract effective. *Laba v. Carey*, 29 N.Y.2d 302, 308, 277 N.E.2d 641, 644, 327 N.Y.S.2d 613, 618 (1971); *National Equipment Rental, Ltd. v. Reagin*, 338 F.2d 759, 762–63 (2d Cir. 1964) (applying New York law). *Cf. Tandy Corp. v. United States*, 626 F.2d 1186, 1190 (5th Cir. 1980) (to correctly interpret a debenture indenture, court must consider the whole document). All parts of the agreement are to be reconciled, if possible, in order to avoid an inconsistency. *National Conversion Corp. v. Cedar Building Corp.*, 23 N.Y.2d 621, 625, 246 N.E.2d 351, 354, 298 N.Y.S.2d 499, 502 (1969). A specific provision will not be set aside in favor of a catch-all clause. *William Higgins & Sons, Inc. v. State*, 20 N.Y.2d 425, 428, 231 N.E.2d 285, 286, 284 N.Y.S.2d 697, 699 (1967). And the normal rule of construction that any fair doubt as to the meaning of the words chosen by the drafting party should be resolved against that party is inapplicable when there are not two possible and reasonable interpretations.[20] *National Equipment*

---

**20.** Broad has argued in the district court and on appeal that any ambiguities in the Indenture should be construed against Rockwell, since its predecessor company, Collins, drafted the Indenture. Given our holding *infra* in parts II–D and II–E of this opinion that the Indenture is unambiguous, we need not reach this issue.

We note, however, that the record in this case does not necessarily support Broad's logic. An equally plausible argument could be made that any ambiguities in the Indenture should be construed against Broad rather than against Rockwell, for the *underwriters' counsel* drafted the provisions at issue in this litigation. See part IV–A of this opinion, *infra*. Broad, as a purchaser from an underwriter (at least indirectly), succeeded to the contractual rights and stands in the shoes of the underwriter who originally purchased those Debentures.

That such arguments, pro and con, can be made at all is itself instructive. While as a matter of abstract contract law it is proper to construe ambiguities against the drafter of a contract, that tenet of contract law has only limited practical significance in the context of construing an indenture. To the extent the rule is practicable at all, it can only be readily applied to those terms that were actually discussed and thought about by the parties—which is almost never the case with boilerplate provisions such as the ones at issue here. On these facts, it is difficult to fathom how even the most diligent, attentive, and intelligent jury could reach a rational conclusion as to the intent of the parties at the time the contract was executed, even were they instructed to construe any ambiguities in the Indenture (the written embodiment of the parties' intent) against the drafter of that document. They would have little on which to base their decision other than the language of the Indenture itself.

Further, given that many other indentures contain language identical to that found in the Indenture at issue here, there is a significant likelihood that other courts would feel bound by a finding by this court that as a matter of law this language is ambiguous. Thus, there is a significant likelihood as well that different juries, construing identical indentures in an attempt to divine "the intent of the parties," would reach different conclusions. This would

*Rental, Ltd.*, 388 F.2d at 763. Because courts are to adjudicate the rights of the parties according to the unambiguous terms of the contract, they therefore must give the words and phrases employed in the contract their plain meaning. *Laba*, 29 N.Y.2d at 308, 277 N.E.2d at 644, 327 N.Y.S.2d at 618.

█ As a matter of law, be it the law of New York or any other jurisdiction with which we are acquainted, the Indenture either is or is not ambiguous. It either does or does not adequately demonstrate the intent of the parties from its own four corners.[21] We cannot emphasize too strongly that the resolution of this issue is for the district court in the first instance, rather than for a jury; and because it is a question of law, we review the district court's decision with the full freedom to substitute our own judgment for that of the court below. The opinions of the many lawyers who have reviewed the Indenture before this litigation reached this court may be quite relevant for some other purposes—e. g., for determining the defendants' good faith or

the lack thereof. We may, but certainly need not, find the force of their legal reasoning compelling, and adopt it as our own. But on the initial and often determinative question of whether the contract sufficiently demonstrates the intent of the parties so as to be enforceable only by reference to the four corners of the document, it does not matter at all how many lawyers have in the past pronounced this contract to be ambiguous or unambiguous. Neither does it matter in whose behalf, or with what motives, or when, they made such arguments. We note that virtually every case involving the interpretation of a contract comes to us with two sets of lawyers and two sets of clients with sharply differing views of the meaning of the contract. But interpreting contracts is ultimately the business of the courts.

## D. *The Meaning of Section 4.11 of the Indenture*

█ The structure of the Indenture is fairly typical of convertible debenture indentures generally.[22] *See* American Bar

---

indeed be anomalous, since the principal goal of using boilerplate language in such contracts is that there be uniform construction of those provisions.

In a different case, construing an indenture with different terms, we might be compelled to direct that a jury attempt such a difficult feat if we found the indenture to be ambiguous as a matter of law. In the case at bar, however, our holding *infra* that the Indenture is unambiguous spares any jury the obligation of undertaking that unenviable task.

21. Broad has argued from time to time in this litigation that we should look to various documents other than the Indenture—e. g., the face of the Debentures, the prospectus under which the Debentures were marketed, and various advertisements and press releases published by the defendants—as alternate sources of contractual rights. With regard to the Debentures and the prospectus, those documents specifically and repeatedly incorporate the Indenture by reference, and warn the investor that the contractual obligations and rights that attend the Debentures are governed solely by the Indenture. The suggestion that the press releases and advertisements constitute enforceable contract provisions in this situation is patently absurd. Those documents may be highly relevant, of course, to Broad's federal securities

claims; but they are *not* a source of contractual rights.

22. The negotiated "business" portions of the Indenture are largely interspersed through the first six articles. Article One contains defined terms. Article Two provides for the form of the Debentures and for certain ministerial processes connected with their issue, registration, and exchange. Article Three sets out the extent to which the debt represented by the Debentures is subordinated to senior indebtedness of Collins. Article Four sets out the conversion privileges. Article Five provides for the redemption of Debentures, and Article Six for the sinking fund mechanism used to redeem a portion of the issue each year. Article Seven contains formal covenants of the issuer (e. g., duly to pay principal, premium, and interest on the Debentures, to maintain corporate offices and a corporate existence) as well as certain special provisions that were negotiated by the issuer and the lead underwriter (e. g., restrictions on incurring funded debt and on paying especially large dividends).

The remainder of the Indenture is largely boilerplate. Article Eight provides certain bookkeeping details. Article Nine defines events of default and the remedies therefor. Article Ten provides for the duties of the Trustee, which are largely governed by the Trust

Foundation, Model Debenture Indenture Provisions—All Registered Issues—1967, *reprinted in Commentaries* at 19 & *passim* (1971). As might be expected, there is an article of the Indenture devoted wholly to the conversion rights of the holders of the Debentures, and a section within that article which addresses the possibility of a merger of Collins with another company: Article Four of the Indenture is entitled "Conversion of Debentures," and the next-to-last section of that Article, Section 4.11, is described in the Indenture's table of contents as governing the "[c]ontinuation of the conversion privilege in case of a consolidation, merger or sale of assets." We note that there is no provision in the Indenture which explicitly mandates that the holders of the Debentures should have a continuing right to convert into common stock *after a merger*. Aside from his few arguments based on the language of Section 4.11, Broad basically argues his case by implication from more general language that is not specifically addressed to the merger context. But because Section 4.11 is more specifically addressed to the merger context than any other provision of the Indenture, we begin our discussion with that particular provision, to see if the language thereof clearly and unambiguously conveys the intent of the parties.

Section 4.11 provides, in pertinent part, as follows:

> In case of any consolidation of [Collins] with, or merger of [Collins] into, any other corporation . . ., the corporation formed by such consolidation or the corporation into which [Collins] shall have been merged . . . shall execute and deliver to the [Trust Company] a supplemental indenture . . . providing that the holder of each Debenture then outstanding shall have the right (until the expiration of the conversion right of such Debenture) to convert such Debenture into the kind and amount of shares of stock and other securities and property receivable upon such consolidation [or] merger . . . by a holder *of the number of shares of Common Stock of* [Collins] into which such Debenture might have been converted immediately prior to such consolidation [or] merger . . . .

Parsing this section into logical units, we note that it serves two purposes. First, it specifies what the Trust Company and Collins' successor must do in the event of a merger in which Collins is not the surviving company: they must execute a supplemental indenture that will formally provide *for* the conversion rights of the holders of Debentures after the merger. There is no question in this case but that Rockwell and the Trust Company complied with this directive, for they did execute a supplemental indenture detailing the post-merger conversion rights of the holders of Debentures. Rather, the question is whether the interpretation they have placed on the language of the Indenture and the supplemental indenture—that after the merger, the holder of a Debenture would have the right to convert a Debenture in the principal amount of $1000 only into $344.75 in cash—fairly and adequately accords to the holders of Debentures their valid rights under the Indenture.

The second part of Section 4.11 provides by its terms that after the merger, the holder of each Debenture shall have the right to convert that Debenture into something—but what? It cannot be Collins

---

Indenture Act of 1939, 15 U.S.C. §§ 77aaa–77bbbb (1976). Article Eleven contains rules for determining the ownership of Debentures and for determining what constitutes collective action by the holders of Debentures. Article Twelve provides for meetings of the holders of Debentures. Article Thirteen authorizes the execution in certain circumstances of supplemental indentures. Article Fourteen comprises provisions intended to apply in the event of a consolidation, merger, or sale of assets of Collins. Article Fifteen contains the procedures for satisfaction and discharge of the Indenture. Article Sixteen limits the personal liability of certain of the company's controlling persons. Article Seventeen, the final article, contains miscellaneous provisions, including a choice of law provision specifying that the Indenture shall be governed by the laws of New York State.

Many of the provisions of the Indenture that are pertinent to this lawsuit are set out in an appendix to the panel opinion, 614 F.2d at 441–47.

Common Stock, for there will be no more of that after the merger. It therefore must be something else other than Collins Common Stock. The *nature* of the "something else" into which the holder of a Debenture can convert his Debenture is specified by reference to what the holders of the Collins Common Stock received in the merger: he can convert into the kind of "shares of stock and other securities and property" that the holders of Collins Common Stock received as part of the Merger Plan. Thus, if the holders of Collins Common Stock had received Rockwell Common Stock in the merger in exchange for giving up their shares of Collins Common Stock, the holders of Debentures would have been entitled, at any time after the merger for so long as their Debentures were outstanding, to convert into Rockwell Common Stock. Alternately, if the holders of Collins Common Stock had received Rockwell debentures in exchange for their Collins Common Stock, the holders of the Debentures would have been entitled to convert into Rockwell debentures.

Broad suggests that the use of the conjunctive "and" in Section 4.11 ("shares of stock *and* other securities *and* property") means that in every instance of a merger, the holders of the Debentures would be entitled to receive all three types of property specified above. This might be a plausible construction, but for the fact that it would make meaningless the qualification to that phrase that follows immediately thereafter—"receivable upon such consolidation [or] merger . . . by a holder of . . . shares of Common Stock of [Collins]." We decline to read Section 4.11 as a mandatory directive that any plan of merger between Collins and another company had to include provisions for the receipt by the holders of Collins Common Stock of both stock on the one hand, *and* other securities and property on the other. Had the parties to the contract wished to fashion such a bizarre provision, they certainly would have done so in a more explicit fashion.

Thus, the plain meaning of Section 4.11 is that after a merger, the *nature* of that "something else" into which the holders of Debentures are entitled to convert in lieu of Collins Common Stock is exactly equivalent to the nature of the "something" that the holders of Collins Common Stock received in the merger. No substantive limit or mandatory specification is provided in Section 4.11 as to what the holders of Collins Common Stock may receive in the merger; but whatever types of compensation the shareholders may receive in exchange for their Collins Common Stock, the holders of the Debentures are entitled to convert into each and all of those types.

In the case at bar, it is undisputed that the holders of Collins Common Stock received *only cash* in exchange for their shares; under the terms of the Merger Plan, they did not receive stock or any other type of property. Thus, the nature of the "something else" into which the holders of Debentures are entitled to convert in lieu of Collins Common Stock is *cash*—not Rockwell Common Stock, not other securities, and not other types of property besides cash.

But Section 4.11 also specifies the *quantity* of the "something else" into which the holders of the Debentures are entitled to convert after the merger. Like the nature of the "something else," the quantity of the "something else" is defined by reference to what the holders of Collins Common Stock received in the merger. Under Section 4.11, each holder of Debentures is entitled to convert each of his Debentures into that amount of the "something else" which was receivable under the terms of the Merger Plan "by a holder of the number of shares of Common Stock of [Collins] into which such Debenture might have been converted immediately prior to such . . . merger."

Thus, Section 4.11 gives us a formula for computing the quantity of the "something else." There are two variables in the formula: the conversion price of the Debentures immediately prior to the merger, and the quantity of the "something" received by the holders of Collins Common Stock in exchange for each share they surrendered

as part of the Merger Plan. Section 4.11 directs that we first determine the number of shares of Collins Common Stock that a holder of Debentures would have been entitled to receive had he converted his Debentures immediately prior to the merger. As of the date of the merger, nothing had happened to trigger any of the conversion price adjustment provisions set out elsewhere in Article Four of the Indenture. Therefore, the conversion price originally specified when the Debentures were issued —$72.50—was still in effect at the time of the merger. At this conversion price, the Debentures were convertible immediately prior to the merger at the rate of 13.79 shares of Collins Common Stock per $1000 in principal amount of the Debentures surrendered.

The formula next provides that we take the quantity of the "something" that was received by the holders of Collins Common Stock in the merger in exchange for each share of Common Stock they surrendered ($25 cash), and multiply that "something" by the number of shares of Collins Common Stock into which the Debentures would have been convertible (13.79 shares per $1000 Debenture). The result is that each $1000 principal amount of Debenture is convertible into $344.75 cash (13.79 × $25).

Under the plain language of Section 4.11, then, we are compelled to the conclusion that Rockwell and the Trust Company correctly fulfilled their duties to execute a supplemental indenture providing for the post-merger conversion rights of the holders of Debentures; further, they correctly calculated those rights as specified by the terms of Section 4.11. Unless there is some compelling reason that we should not give the language of this Section its plain meaning, Broad's breach of contract claim must fail.

E. *Reconciling Section 4.11 with the Remainder of the Indenture*

1. *The "Iowa law" argument.*—Broad's first argument against giving the language of Section 4.11 its plain meaning is based indirectly on the "and other securities and property" clause. Broad concedes that under New York law, the term "property" includes cash within its scope. But, he argues, the parties could not have intended at the time of the Indenture's execution that the right to convert into cash could be substituted for the right to convert into Collins Common Stock. As support for this argument, he notes that Collins was incorporated under the laws of Iowa, and that as of 1967, when the Indenture was executed, Iowa law did not permit a merger in which the shareholders of the merged company received only cash in exchange for their shares. Rockwell and the Trust Company concede that such a merger was not possible under Iowa law until 1970.

The actual language of Section 4.11, however, is entirely inconsistent with Broad's argument. If the intent of the parties was that the right to convert into Collins Common Stock would be replaced in the event of a merger with a right to convert into only common stock of another company, then the phrase "and other securities and property" would be meaningless surplusage with no effect. Under the New York rules of contract construction discussed above, contracts should be construed so as to give meaning to all provisions. The phrase "and other securities and property" can only have meaning if the contract is interpreted to mean that the parties intended that the holders of Debentures should be entitled to convert into *whatever* types of compensation the holders of Collins Common Stock could receive under the state law governing mergers at any given point in time.

We note as well that it would be entirely inconsistent with the tone and purpose of the remainder of the Indenture—which was drafted to provide, insofar as humanly possible, for every imaginable contingency—to impute to the parties an intent to freeze as of the year 1967 the nature of the property into which the Debentures were convertible. If that were in fact their intent, it would have ill served the holders of the Debentures. As our discussion above in part II–B of this opinion indicates, the conversion rights of the holders of Debentures are

purely contractual in nature. Absent a contractual provision specifying that the conversion right would be replaced with the right to convert into something other than Collins Common Stock, post-merger holders of Debentures have no right to convert into *anything*. Thus, if the intent of the parties was that the right of the holders of the Debentures *to convert into Collins Common Stock* would be replaced with the right to convert into only whatever *common stock* the holders of Collins Common Stock received under the Merger Plan, the holders of Debentures would be entitled to convert into *nothing*, since the holders of Collins Common Stock received no common stock. The construction of the Indenture that we instead adopt is by far more flexible and equitable to all concerned.

■■■ *2. Other arguments based on Article Four.*—Broad next argues that the Indenture elsewhere provides an absolute, unabridgeable right to convert into Collins Common Stock at any time while the Debentures are outstanding. He first points to Section 4.01, which provides in pertinent part as follows:

> *Subject to and upon compliance with the provisions of this Article Four*, at the option of the holder thereof, any Debenture . . . may, *at any time* [while the Debentures are outstanding] be converted . . . into fully paid and non-assessable shares . . . of Common Stock of [Collins]
> . . . .

(Emphasis added.) Broad would have us read the "at any time" language as precluding the effect we would otherwise give to the language of Section 4.11.

In the first place, if there were any conflict between the above-quoted language of Section 4.01 and Section 4.11, the latter would control under principles of New York contract law, since of the two sections, Section 4.11 is more specifically addressed to the merger context. But in fact there is no conflict. Broad's suggested construction would make sense only if we were to ignore the introductory phrase of Section 4.01— "[s]ubject to and upon compliance with the provisions of this Article Four." Section

4.11 is part of Article Four, and Section 4.01, by its very terms, is explicitly made subject to that article. Thus, the "at any time" language of Section 4.01 is implicitly qualified by reference to Section 4.11 to mean "at any time—except in the merger context, at which point Section 4.11 becomes applicable."

Broad makes a similar argument based on the language of Section 4.07, which provides in pertinent part as follows:

> [Collins] shall *at all times* reserve and keep available, free from pre-emptive rights, out of its authorized but unissued Common Stock, for the purpose of effecting the conversion of the debentures, the full number of shares of Common Stock *then issuable upon the conversion of all outstanding Debentures.*

(Emphasis added.) Again, were there a conflict between this Section and Section 4.11, the latter would control because it is more specifically addressed to the merger context. Nonetheless, we find no conflict. Even though not prefaced by the "subject to . . . the provisions of this Article Four" language, Section 4.07 by its terms only applies in those circumstances when the conversion right, if exercised, would result in the issuance of Collins Common Stock. The obligation to maintain sufficient shares of Collins Common Stock can have no meaning when there is no longer a conversion right into that stock. There is no such right after a merger in which Collins is not the surviving company. Under this interpretation, Sections 4.11 and 4.07 mesh perfectly.

It is also noteworthy that Article Four contains lengthy and complex provisions which mandate the adjustment of the conversion price upon specified conditions that would otherwise dilute the value of the conversion feature. *Nowhere* in Article Four, nor elsewhere within the four corners of the Indenture, is there *any* formula by which one could determine the ratio at which the Debentures would be converted into the surviving corporation's common stock. It would seem likely that such a formula would have been provided along

with all the other conversion price adjustments, had the intent of the parties to the Indenture been that there should be an absolute right to convert into common stock of some sort, even in the event of a merger in which Collins and the Collins Common Stock would disappear.[23]

3. *Arguments based on Article Fourteen.*—Section 14.01 provides in pertinent part as follows:

> Nothing in this Indenture shall prevent any consolidation or merger of [Collins] with or into any other corporation or corporations (whether or not affiliated with [Collins]) . . .; provided, however, and [Collins] hereby covenants and agrees, that upon any such . . . merger, . . . the due and punctual payment of the principal of (and premium, if any) and interest on all of the Debentures, according to their tenor, and the due and punctual performance and observance of all the terms, covenants and conditions of this Indenture to be performed or observed by [Collins], shall be expressly assumed, by indenture supplemental hereto, satisfactory in form to the [Trust Company], executed and delivered to the [Trust Company] by the corporation formed by such consolidation, or by the corporation into which [Collins] shall have been merged . . . .

We begin by noting that the first phrase of this Section strongly supports the construction of the Indenture proffered by Rockwell and the Trust Company and accepted by the district court: if the Indenture provided an absolute right to convert into Collins Common Stock, there could be no completed merger of Collins into another company. The fact that Section 14.01 qualifies the entire Indenture evidences a strong and compelling intent of the parties that Collins should not be prevented from merging into another company by its obligations to the holders of the Debentures under the Indenture.

Broad's argument is based on the second clause of Section 14.01, which requires that the surviving corporation in a merger expressly assume "the due and punctual performance and observance of all the terms, covenants and conditions of this Indenture." He argues that this requires the surviving company to observe the covenants made by the issuer in Sections 4.01 and 4.07—the "at all times" covenants discussed above in part II–E–2 of this opinion. Unfortunately for Broad, however, we have determined that those sections are not at all inconsistent with the interpretation we have placed on Section 4.11: in effect, Section 4.11 overrides those Sections. It is undisputed that Rockwell and the Trust Company did execute a supplemental indenture providing that Rockwell would observe all of those covenants applicable after the merger; likewise, it is undisputed that Rockwell has abided by those covenants, including the honoring of the debt obligation on the Debentures. Rockwell also stands ready to honor the conversion rights set out in the supplemental indenture, which have been adjusted pursuant to Section 4.11.

Section 14.02 provides in pertinent part as follows:

> In case of any such . . . merger, . . . and upon the execution by the successor corporation of an indenture supplemental hereto, as provided in Section 14.01, and upon compliance by such successor corporation with all applicable provisions of Section 4.11, such successor corporation shall succeed to and be substituted for [Collins] . . . .
>
> In case of any such . . . merger, . . . such changes in phraseology and form (but not in substance) may be made in the Debentures thereafter to be issued as may be appropriate.

---

**23.** Such a formula could have been drafted with little difficulty, had the parties intended that there be an absolute right to convert into the surviving company's common stock. For example, the drafters could have provided that a post-merger holder of Debentures would have the right to convert into that number of shares of the surviving company's common stock which had an aggregate market value immediately prior to the merger that was equal to the aggregate market value of the number of shares of Collins Common Stock into which the holder of Debentures could have converted immediately prior to the merger.

(Emphasis added.) As stated above, Rockwell and the Trust Company did execute a proper supplemental indenture as provided for in Section 14.01, and they did comply with the applicable provisions of Section 4.11 in executing that supplemental indenture. Rockwell has properly succeeded to Collins' rights and obligations under the Indenture. Broad's arguments under Sections 14.01 and 14.02 must fail.

■ *4. Arguments based on Article Thirteen.*—Article Thirteen of the Indenture governs the circumstances in which the issuer and the Trustee can execute a supplemental indenture. Section 13.01, which is described in the Indenture's table of contents as specifying the "[p]urposes for which supplemental indentures may be entered into without consent of the Debentureholders," provides in pertinent part as follows:

[Collins], when authorized by a resolution of its Board of Directors, and the [Trust Company], subject to the conditions and restrictions in this Indenture contained, may from time to time and at any time enter into an indenture or indentures supplemental hereto . . . for one or more of the following purposes:

(a) *to make provision with respect to the conversion rights of holders of the Debentures pursuant to the requirements of Section 4.11;*

(b) to evidence the succession of another corporation to [Collins], or successive successions, and the assumption by the successor corporation of the covenants, agreements and obligations of [Collins] pursuant to Article Fourteen;

(c) to add to the covenants and agreements of [Collins] in this Indenture contained such further covenants and agreements thereafter to be observed, and . . . to surrender any right or power herein reserved to or conferred upon [Collins];

(d) to cure any ambiguity or to correct or supplement any defective or inconsistent provision contained in this Indenture or in any supplemental indenture; and

(e) to make such provisions with respect to matters or questions arising under this Indenture as may be necessary or desirable and not inconsistent with this Indenture; *provided that such action shall not adversely affect the interests of the holders of any of the Debentures.*

The [Trust Company] is hereby authorized to join in the execution of any supplemental indenture authorized or permitted by the terms of this Indenture

. . . .

Any supplemental indenture authorized by the provisions of this Section 13.01 may be executed by [Collins] and the [Trust Company] without the consent of the holders of any of the Debentures at the time outstanding, notwithstanding any of the provisions of Section 13.02.

(Emphasis added.) We begin by noting that the first clause of this section reinforces our conclusions in part II–D of this opinion, *supra*, that Section 4.11 of the Indenture is intended to "make provision with respect to the conversion rights of holders of the Debentures" in the event of merger. Section 4.11, it will be recalled, requires in part that the surviving company in a merger execute a supplemental indenture in which is detailed the precise nature of the post-merger conversion rights of the holders of the Debentures, as calculated by the formula set out in Section 4.11.

Broad and the defendants have argued vigorously the question whether the last phrase in clause (e) of Section 13.01 modifies the entire section, or only clause (e). We agree with the defendants that under the most logical reading of Section 13.01, the phrase "provided that such action shall not adversely affect the interests of the holders of any of the Debentures" logically modifies only clause (e).[24] Next, as we have

24. Clause (e) is as close to being an "openended" provision as anything in the Indenture; it would only make sense to limit the broad grant of the power to "make such provisions . . . as may be necessary or desirable" to those situations in which the interests of the holders of

noted before, Section 4.11 is the most specific recitation of the rights of the holders of the Debentures in the event of a merger; clause (a) of Section 13.01 ties in directly, and with equal specificity, to Section 4.11. Were there a conflict between those two provisions and the catch-all last phrase of clause (e) of Section 13.01, the former provisions would govern.

But more fundamentally, the execution of a supplemental indenture that complies with the directives of Section 4.11 does *not* "adversely affect the interests of the holders of any of the Debentures." The holders of Debentures have a legitimate interest only in those rights that are accorded them under the Indenture. Section 4.11 specifies what those rights are in the event of a merger; therefore, the execution of a supplemental indenture that complies with the requirements of Section 4.11 cannot be adverse to the legitimate interests of the holders of Debentures.

Broad also argues from the language of Section 13.02, despite the specific statement in Section 13.01 that a supplemental indenture required by Section 4.11 and clause (a) of Section 13.01 may be executed notwithstanding anything in Section 13.02. This statement in Section 13.01 should, and does, foreclose any arguments under Section 13.02.

But even under Section 13.02, which is described in the Indenture's table of contents as providing for the "[m]odification of Indenture with consent of holders of 66⅔% in principal amount of Debentures," there is no help for Broad. Section 13.02 requires the permission of the holders of two-thirds of the Debentures before the issuer and the Trustee may execute a supplemental indenture that in any manner changes the rights and obligations of the parties to the Indenture or of the holders of the Debentures;

certain types of alterations, including alterations of "the right to convert the [Debentures] into [Collins] Common Stock at the prices and *upon the terms provided in this Indenture,*" are prohibited outright unless the Trustee and the issuer can obtain "the consent of the holder of each Debenture so affected." (Emphasis added.) Even were Section 13.02 applicable to those supplemental indentures that are required by Section 4.11 and clause (a) of Section 13.01, Section 13.02 would not prohibit that type of supplemental indenture, and neither would it require the consent of the holders of two-thirds or all of the Debentures: it is indisputable that one of the "terms provided in [the] Indenture" is Section 4.11 itself, and thus such a supplemental indenture does not *alter* the conversion rights of the holders of the Debentures. Rather, the supplemental indenture required under Section 4.11 merely evidences that all the requisite formalities for the clarification and protection of those rights have been complied with—*i. e.*, that the formula set out in Section 4.11 has become applicable, and that the surviving company of the merger has formally accepted all the other obligations of, and been fully substituted for, the original issuer.

## F. Our Conclusions With Respect to the Indenture

We conclude, after examining the entire Indenture in addition to those portions discussed specifically above, that the district court was correct in its conclusion that the Indenture is unambiguous. The intent of the parties is clearly evident from the four corners of the document. Section 4.11 fully and unambiguously sets out the conversion rights of the holders of the Debentures in the event of a merger in which Collins is not the surviving corporation: the holder of any outstanding Debenture is entitled to

Debentures would not be adversely affected, lest the issuer's and Trustee's rights become so vague and unlimited as to render the entire contract unenforceable. The fact that this phrase is appended to the end of clause (e), rather than being set out after clauses (a) through (e) on a separate line beginning at the left margin, is also indicative of an intent that

the phrase modify only clause (e). Further, elsewhere in the document, where the context clearly indicates that modifying phrases are intended to apply to several sequentially numbered clauses, those phrases *are* set out on separate line which begins at the left margin, or in introductory segments that precede all of the numbered clauses.

convert his Debenture into only that which he would have received had he converted it into Collins Common Stock immediately prior to the merger. On the facts of this case, that means a converting holder of a Debenture is entitled to receive $344.75 in cash for each $1000 in principal amount of the Debenture. *Accord, Brucker v. Thyssen-Bornemisza Europe N. V.*, 424 F.Supp. 679, 688–90 (S.D.N.Y.1976) (construing virtually identical indenture provisions against similar claims in similar context, and finding no abridgement of the rights of the holders of debentures because "the debenture holders have never had an absolute right [under the indenture] to convert into [the issuer's] stock in a merger"), *aff'd mem. sub nom. Brucker v. Indian Head, Inc.*, 559 F.2d 1202 (2d Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977).[25] *Cf. Broenen v. Beaunit Corp.*, 440 F.2d 1244, 1248–49 (7th Cir. 1970) (under New York law, provision virtually identical to Section 4.11 of the Indenture mandated that holders of convertible debentures receive conversion right into that which holders of common stock received in a three-cornered merger, which was common stock of surviving company's parent company); *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 939 (Del.1979) (holder of convertible preferred stock after recapitalization is to receive "not what he would have received *before* recapitalization; that was the common stock . . . . Certainly [clause similar to Section 4.11 of the Indenture] is meaningless if the common share remains issuable *after* recapitalization" (emphasis in original)); *B. S. F. Corp. v. Philadelphia National Bank*, 204 A.2d 746, 750–51 (Del.1964) (construing virtually identical provisions in the context of a sale of "substantially all" of the issuer's assets).

█ It is not the function of a court to rewrite a contract's terms in the process of "interpretation" to make them accord with the court's sense of equity. *DeVanzo v. Newark Insurance Co.*, 44 A.D.2d 39, 43, 353

N.Y.S.2d 29, 32 (2d Dep't 1974), *aff'd*, 37 N.Y.2d 733, 337 N.E.2d 131, 374 N.Y.S.2d 619 (1975). And yet, even were we inclined to do so, we are by no means certain that the outcome would be any different in this case.

Broad's persistent complaint has been that the Debentures' conversion feature was suddenly and arbitrarily liquidated, *without permission or compensation*. While the conversion feature has not technically been eliminated, since the holders of the Debentures retain the right to convert into $344.75 in cash for each $1000 principal amount of Debentures, it is true that the merger did eliminate the possibility that the holders of the Debentures would benefit as a result of the future profitability of the Collins business, just as the merger eliminated that possibility for the holders of Collins Common Stock. A purchaser of Debentures, however, takes the risks inherent in the equity feature of the security, risks that are shared with the holders of Collins Common Stock. One of those risks is that Collins might merge with another company—which is effectively the risk that any individual investor's assessment of the value of Collins Common Stock, based on Collins' prospects for the future, will be replaced by the collective judgment of the marketplace and the other investors in Collins who might vote in favor of the merger. This—like the risk that Collins' future operations might be lackluster, with the result that conversion might never be economically attractive—is simply a risk inherent in this type of investment.

The terms of the merger necessarily reflected the business prospects of Collins as of 1973. The fact that the initial high hopes that the holders of Debentures had for the equity securities of Collins—hopes that were identical to those of the equity shareholders—were defeated by the economic setbacks Collins suffered between 1967 and 1973 is not alleged in this lawsuit

---

**25.** The Second Circuit's decision in *Brucker* was an "[o]ral opinion delivered in open court in the belief that no jurisprudential purpose would be served by a written opinion. An oral opinion or a summary order is not citable as precedent. [Second Circuit] Local Rule § 0.23." 559 F.2d at 1202 n.*.

to be anyone's fault, least of all Rockwell's or the Trust Company's. When the market set the price of Collins Common Stock at less than $20, that price reflected the current aggregate judgment of the marketplace as to Collins' prospects for the future. The tendering shareholders, and those who gave up their shares in the merger, actually received a premium of roughly $5 per share over the market price—a bonus of some 25%. The post-merger conversion terms mandated by Section 4.11 accorded the holders of the Debentures the benefit of that premium. They were accorded, as a result of the equity feature of the Debentures, the same treatment that the holders of Collins Common Stock received, and they received value based, in part, on Collins' prospects for the future. Insofar as the debt feature of the Debentures is concerned, they benefited by the merger in that the Debentures are now backed by a financially more secure corporation.

Based upon our interpretation of the Indenture, and without hesitation given the nature of convertible debentures, we affirm the judgment of the district court with regard to Broad's breach of contract claims. We turn next to the other associated state-law claims that were within the pendent jurisdiction of the district court.

## III. ASSOCIATED STATE – LAW CLAIMS

### A. The Implied Covenant of Fair Dealing

As we understand New York law, every contract governed by the laws of that State necessarily contains an implied-by-law covenant to act fairly and in good faith in the course of performing the contract. *E. g., Rowe v. Great Atlantic & Pacific Tea Co.,* 46 N.Y.2d 62, 68, 385 N.E.2d 566, 569, 412 N.Y.S.2d 827, 830 (1978); *Van Gemert v. Boeing Co.,* 520 F.2d 1373, 1383–85 (2d Cir.), *cert. denied,* 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), *appeal after remand,* 553 F.2d 812, 815 (2d Cir. 1977) (applying New York law). The panel that first heard this case thought the Indenture to be ambiguous on the question of the conversion rights remaining with the holders of Deben-

tures after a merger, and held that the evidence produced by Broad prior to the directed verdict raised a jury question as to whether Broad and the Trust Company had dealt fairly and in good faith with the holders of Debentures in the light of that ambiguity. 614 F.2d at 429–30. Having reached a different conclusion than the panel did on the ambiguity issue, we are compelled to a different result on the good faith and fair dealing issue as well.

We note first that this implied covenant of good faith and fair dealing cannot give the holders of Debentures any rights inconsistent with those explicitly set out in the Indenture. "[W]here the instrument contains an express covenant in regard to any subject, no covenants are to be implied with respect to the same subject . . . ." *Burr v. Stenton,* 43 N.Y. 462, 464 (1871). "It is . . . well established in New York that, where the expressed intention of contracting parties is clear, a contrary intent will not be created by implication." *Neuman v. Pike,* 591 F.2d 191, 194 (2d Cir. 1979) (citing and applying New York law). The covenant is breached only when one party to a contract seeks to prevent its performance by, or to withhold its benefits from, the other. *Collard v. Incorporated Village of Flower Hill,* 75 A.D.2d 631, 632, 427 N.Y.S.2d 301, 302 (2d Dep't 1980). The mere exercise of one's contractual rights, without more, cannot constitute such a breach. *See Mutual Life Insurance Co. v. Tailored Woman, Inc.,* 309 N.Y. 248, 254, 128 N.E.2d 401, 403 (1955).

Broad relies here, as he did in the district court and before the panel, on the *Van Gemert* case cited above. The issue in that case was whether holders of Boeing debentures received adequate notice of the redemption of the debentures to allow them a meaningful opportunity to exercise the debentures' conversion feature. The *Van Gemert I* court held that although Boeing had formally complied with the notice provisions in the governing indenture, merely placing those provisions in the indenture was an inadequate means of apprising the holders of debentures of what notice would

be given in the event of a redemption call. Absent more specific warning on the face of the debentures or elsewhere that the debentures could be called upon the minimal notice provided in the indenture, the court held that the "reasonable expectations" of the holders of debentures as to notice would be protected. 520 F.2d at 1383–85. The court stressed that "[t]he debenture holder relies on the opportunity to make a proper conversion on due notice. Any loss occurring to him from failure to convert, as here, is not from a risk inherent in his investment but rather from unsatisfactory notice procedures." *Id.* at 1385. In explaining the basis for its holding in the earlier appeal, the *Van Gemert II* court described its earlier decision as "merely appl[ying] the settled principle, 'that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .' " 553 F.2d at 815 (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933); elipsis inserted by the Second Circuit).

We do not find the *Van Gemert* opinions of particular relevance to the case at bar.[26] The "loss," if any, suffered by the holders of Debentures was certainly not the result of unsatisfactory administrative procedures in the Indenture; rather, this case turns on the question of substantive rights that are basic to the nature of the contract. The risk of merger *was* inherent in the investment made by the holders of Debentures. Rockwell and the Trust Company did nothing that could be described as "destroying or injuring the right of the other party to receive the fruits of the contract," because under our holding in part II of this opinion, *supra*, the benefits that the holders of Debentures received were all the rights to which they were contractually entitled. Indeed, had Rockwell conferred on the holders

of Debentures rights significantly greater than those set out in the Indenture, it might have faced claims by its own shareholders for waste and corporate mismanagement. We believe this case to be governed by the other New York cases we have cited above. *See also Levine v. Chesapeake & Ohio Railroad Co.*, 60 A.D.2d 246, 248–50, 400 N.Y.S.2d 76, 78–79 (1st Dep't 1977) ("no actionable unfairness" in defendants' conduct, which eliminated public market for railroad's common stock, into which plaintiffs' bonds were convertible). As a matter of law, given our interpretation of the Indenture and the testimony concerning the conduct of the defendants (viewed in the light most favorable to Broad), we hold that the defendants did not violate the covenant of good faith and fair dealing that is implied into the Indenture under New York law. Accordingly, we affirm the judgment of the district court with respect to this claim.

### B. The Breach of Fiduciary Duty Claims

In part IV–C–1 of its opinion, 614 F.2d at 430–31, the panel held that Rockwell owed the holders of Debentures a fiduciary duty of good faith and fair dealing because it controlled both parties to the 1973 merger. But the panel also held that if, on remand, the jury were to find that Rockwell had fully complied with its obligations under the Indenture, its fiduciary obligations also would have been discharged as a matter of law.

We may assume, without deciding, that the panel was correct in its conclusion that Rockwell was charged with a fiduciary duty to the holders of Debentures. But since we have determined in part II of this opinion that Rockwell fully complied with its obligations under the Indenture, there is no need for a jury to hear this claim, even if the panel's analysis is correct: under that analysis, as applied in the light of our

**26.** There is some indication that the *Van Gemert I* court was not entirely comfortable with its application of New York law. *See* 520 F.2d at 1382 n.19 (Oakes, J., indicating that he would have preferred to grant relief on the ground that the indenture's terms were implicitly modified by a listing agreement with the New York Stock Exchange). And we are by no means certain that the principles of New York law cited by the *Van Gemert II* court, although themselves indisputable, actually support the result the court reached.

holding with respect to the Indenture, Rockwell can have no liability for breach of fiduciary duty. Accordingly, we affirm the judgment of the district court with respect to the breach of fiduciary duty claim against Rockwell.

In part IV–C–2 of its opinion, 614 F.2d at 431–32, the panel held that the Trust Indenture Act did not create any fiduciary obligations in addition to those imposed on the Trust Company under state law. For the reasons stated by the panel, we agree, and so hold. *Accord, Browning Debenture Holders' Committee v. DASA Corp.*, 560 F.2d 1078, 1083 (2d Cir. 1977) (finding such a claim frivolous). There remains the question of the Trust Company's liability for breach of fiduciary duty under applicable state law.

The panel relied on *Dabney v. Chase National Bank*, 196 F.2d 668 (2d Cir. 1952), and *United States Trust Co. v. First National City Bank*, 57 A.D.2d 285, 394 N.Y.S.2d 653 (1st Dep't 1977), *aff'd mem.*, 45 N.Y.2d 869, 382 N.E.2d 1355, 410 N.Y.S.2d 580 (1978), for its conclusion that even in the absence of a default, an indenture trustee is cloaked under New York law with a fiduciary duty to the holders of debentures that may extend beyond its strict obligations under the indenture. Both *Dabney* and *City Bank* involved conflicts of interest in which the trustee put itself in a position of advantage over the beneficiaries of the trust. Arguably, the Trust Company faced a similar conflict of interest in the case at bar when Rockwell threatened to bring a lawsuit, to withdraw other business it had with the Trust Company, and to force the Trust Company's resignation as Trustee if it refused to execute the supplemental indenture necessary for the merger.

Be that as it may, however, there is no actionable wrong in this case. We assume, without deciding, that the panel was correct in concluding that under New York law, the Trust Company's obligations "exceeded the narrow definitions of its duties in the indenture and encompassed fiduciary duties as well." 614 F.2d at 432. And had we agreed with the panel that the Indenture was ambiguous, there would be a real question whether the holders of Debentures had received in the supplemental indenture all that was contractually due them under the Indenture. Were that question answered in the negative, there would have been the further question whether the Trust Company had adequately discharged its duties to the holders of Debentures with the "absolute singleness of purpose" required by New York law. *Dabney*, 196 F.2d at 671. The evidence in the record regarding the advice given the Trust Company by its counsel prior to the execution of the supplemental indenture undoubtedly would have been relevant to the Trust Company's defensive claim that it had acted in good faith and on advice of counsel.

But the question of whether the holders of Debentures received in the supplemental indenture all that was contractually due to them is conclusively answered by our holding in part II of this opinion, *supra*. Regardless of the Trust Company's motives, or its prior opinion as to the meaning of the Indenture, there is no question but that the Trust Company's ultimate action—executing the supplemental indenture—fully protected what we have determined to be the legitimate rights of the holders of Debentures under the Indenture. Broad has cited no New York authority for the proposition that an indenture trustee has a duty, fiduciary or otherwise, to seek for the holders of debentures any benefits that are *greater* than those contractually due them; indeed, there is support in the New York cases for the opposite conclusion. *See Hazzard v. Chase National Bank*, 159 Misc. 57, 287 N.Y.S. 541 (Sup.Ct.1936), *aff'd mem.*, 257 A.D. 950, 14 N.Y.S.2d 147 (1st Dep't 1939), *aff'd mem.*, 282 N.Y. 652, 26 N.E.2d 801, *cert. denied*, 311 U.S. 708, 61 S.Ct. 319, 85 L.Ed. 460 (1940). We hold that the Trust Company had no duty, as a matter of law, to do anything other than that which it in fact did. Thus, there is no question for a jury as to whether there has been a breach of fiduciary duty. Accord-

ingly, we affirm the judgment of the district court with respect to both the state and federal breach of fiduciary duty claims against the Trust Company.[27]

## IV. THE FEDERAL SECURITIES CLAIMS

We reach at last Broad's federal securities claims, which provided the jurisdictional predicate for the pendent state-law claims we have heretofore discussed. Broad alleges two separate claims under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1980). We deal with those claims in turn, and though we reach the same ultimate conclusion as did the district court and the panel, we emphasize that we do so on far narrower grounds. We make no new law under Rule 10b–5 today, but merely apply well-settled principles to the facts of this case.

27. Given our holdings on the liability issues under each of Broad's state-law claims, we find it unnecessary to reach the district court's alternate ground for the directed verdict—*i. e.,* that no damages had been sustained as a matter of state law. We also find it unnecessary to reach Rockwell's argument that the panel erred in holding that the filing of a class action by Broad was adequate notice of default under the terms of the Indenture, 614 F.2d at 433.

28. Broad apparently seeks to hold Rockwell liable on this count under the theory that it is responsible as Collins' successor for Collins' alleged violations of Rule 10b–5 at the time the Debentures were issued. The involvement of the Trust Company in this count is less clear, since the Trust Company had no connection with the Debentures until it succeeded Chase as Trustee in May 1970. Presumably, Broad would impose on the Trust Company the duty to notice that the workings of Section 4.11 had not been detailed to the holders of Debentures in the prospectus or other sales materials, and to remedy that omission. We express no opinion on this theory.

29. Rockwell has argued that the duty to disclose material facts imposed under the Securities Exchange Act of 1934 had been met as a matter of law in this case. While the face of the Debentures, the prospectus, and the advertisements and press releases issued in connection with the marketing of the Debentures did

### A. The Failure to Disclose the Post-Merger Conversion Terms Set Out in the Indenture

In his first federal claim, Broad essentially alleges that at the time the Debentures were issued in 1967, and thereafter up until the time of the merger in the fall of 1973, the defendants [28] omitted to disclose a material fact with regard to the contractual terms under which the Debentures operated —specifically, that under the terms of the Indenture, the right to convert into Collins Common Stock could, in the event of a merger, be replaced with the right to convert into only that which the holders of Collins Common Stock received in the merger.[29] Broad argues that this constituted a knowing, intentional, and reckless failure to disclose a material fact. The language of Section 4.11, of course, was available to anyone who cared to look at the Indenture, so Broad's claim can only be that the defendants should have made specific reference in the prospectus and other materials to that provision of the Indenture.

not specifically detail the operation of Section 4.11 of the Indenture, those communications by their nature must be relatively short and direct in comparison with the Indenture itself; it is both unwise and impractical, Rockwell argues, to require that these materials set out in detail the many provisions in the Indenture that might be called into play upon the happening of some future, uncertain contingency. The best that can realistically be expected of an issuer— and, according to Rockwell, the only legal obligation—is to indicate generally that the precise contractual rights attending the Debentures are specified in the Indenture, and to incorporate that document by reference into the prospectus and other marketing materials. Broad's counter-argument, of course, is that the terms upon which the Debentures may be converted are so material—so essential to the making of an informed investment decision—that the effect of even somewhat remote contingencies on the conversion terms should be explained in the prospectus and other materials.

This is certainly a difficult question of law and policy. Although we base our disposition of this claim on different grounds entirely, we do not wish to be read as implying an answer to that question by our failure to base our decision thereupon. Rather, we leave this question for some future case in which the answer thereto makes a difference in the outcome.

His claim can alternately be read as a misrepresentation claim—*i. e.*, that various statements on the face of the Debentures, in the press releases and advertisements, and in the prospectus (all to the effect that the Debentures were convertible into Collins Common Stock at any time up until 1987) were misleading.

 It is a familiar proposition since the Supreme Court's decision in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that as part of his case a plaintiff must allege and prove that the defendants acted with "scienter"—"a mental state embracing an intent to deceive, manipulate, or defraud." *Id.* at 193–94 n.12, 96 S.Ct. at 1381 n.12. The holding of that case was that mere negligence is insufficient to support liability in a private suit for damages under Rule 10b–5. The Court specifically left open, however, the question of whether recklessness could satisfy the scienter requirement. *Id. See also Aaron v. SEC*, 446 U.S. 680, 686 n.5, 100 S.Ct. 1945, 1950 n.5, 64 L.Ed.2d 611 (1980) (adopting definition of scienter as "a mental state embracing intent to deceive, manipulate, defraud" in the context of SEC enforcement proceedings, but leaving open the question of whether scienter may also include reckless behavior).

Several other circuits that have considered the question have held that recklessness could satisfy the scienter requirement. *E. g., Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1023 (6th Cir. 1979); *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44 (2d Cir.), *cert. denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir. 1977); *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1039–40 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977). The recklessness described by the Seventh Circuit in *Sanders* and *Sundstrand* is limited to

> a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Sundstrand*, 553 F.2d at 1045. The Seventh Circuit characterized that sort of recklessness as "equivalent to willful fraud." *Id.*

 The panel opinion in this case agreed with our sister circuits that recklessness, properly defined and adequately distinguished from mere negligence, could satisfy the scienter requirement. The panel adopted the definition of recklessness that was articulated by the Seventh Circuit in *Sundstrand* and *Sanders*. 614 F.2d at 439–40. During the period that this case was pending before the en banc court, several other panels also addressed the topic in varying degrees.[30] In particular, while noting that the en banc court had not yet spoken on this question, a panel of this court explicitly held in *G. A. Thompson & Co. v. Partridge*, 636 F.2d 945, 961–62 & nn. 32–34 (5th Cir. 1981), that "severe recklessness" was sufficient to satisfy the scienter requirement. Accordingly, we hold that in the context of a private action for money damages brought under section 10(b) and Rule 10b–5, the requirement that the plaintiff prove scienter—*i. e.*, a mental state embracing intent to deceive, manipulate, or defraud—is satisfied by proof that the defendants acted with severe recklessness. Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely

---

**30.** *Croy v. Campbell*, 624 F.2d 709, 715–16 (5th Cir. 1980), relied upon the panel's now-vacated adoption of the *Sundstrand* standard, but concluded, as did the panel in this case, that the record evidence could support no more than a finding of simple negligence. In *SEC v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 & n.17 (5th Cir. 1980), Judge Reavley first pointed out that most courts which have considered the degree of recklessness necessary to satisfy the scienter requirement have set a very high standard, and accordingly held that the SEC had not demonstrated clear error in the district court's finding that recklessness had not been proved. *Dwoskin v. Rollins, Inc.*, 634 F.2d 285, 289-90 & n.1, 291 (5th Cir. 1981), noted that this circuit's position on this question was at that time unsettled, but affirmed a directed verdict on the ground that the evidence in that case did not present a jury question on scienter even assuming the *Sundstrand* standard applied.

simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

■ Applying this standard to the case at bar, we note that there is precious little testimony in the record concerning the events at the time the Debentures were issued. The creators of and original parties to the Indenture were Collins on the one hand, and a team of underwriters on the other. The underwriters were managed by Kidder, Peabody & Co. Incorporated and White, Weld & Co. Both sides were represented by counsel: Collins by Lynch, Dallas, Smith & Harman of Cedar Rapids, Iowa, and the underwriters by Sullivan & Cromwell of New York. C. J. Lynch of the Lynch, Dallas firm testified by deposition that the basic form of the Indenture was lifted from indentures that Collins and these underwriters had used in prior convertible debenture offerings by Collins; those indentures from the prior offerings had been drafted in the first instance by Kidder, Peabody's counsel, Sullivan & Cromwell.

The Indenture that emerged for the 1967 offering was only partially the result of actual negotiation between the parties. In the normal course of events, the issuer and the lead underwriter actively negotiate the business portions of an indenture, which deal with such provisions as the aggregate principal amount of the debentures, their maturity date, the interest rate they bear, the subordination of the debt they represent to any senior indebtedness, the rate at which they may be converted into common stock, the redemption prices and dates, and so forth. The remainder of the indenture is invariably made up of boilerplate provisions that typically are not discussed at all by either the representatives of the issuer or those of the lead underwriter; indeed, most of those provisions are not even discussed by counsel for the respective parties, and many of them are required by federal law to be inserted into the indenture verbatim. Mr. Lynch's testimony in

this case indicates that the drafting of the Indenture for the 1967 Collins Debenture issue was absolutely typical of industry practice: the boilerplate provisions, including those upon which this lawsuit turns, were never specifically discussed.

Such testimony as there is indicates that no party specifically considered at that time the possibility that Section 4.11 of the Indenture would be called into play at some future date, although Mr. Lynch testified that he had at some point "reviewed" the language of that section on Collins' behalf and found it satisfactory. There is no indication in the record that anyone acting for either Collins or the underwriters considered the inclusion in the prospectus and other sales materials of a detailed description of the operation of Section 4.11. Indeed, the testimony in the record overwhelmingly indicates that the parties thought themselves to be under no legal duty to disclose in detailed fashion in the prospectus and other sales materials any of the Indenture's provisions for more remote future contingencies. Neither is there evidence to raise a jury question on whether the defendants engaged in a continuing course of conduct to deceive subsequent purchasers after the Debentures were issued. Counsel for Broad even conceded, in arguing against the defendants' motions for a directed verdict in the trial court, that there was insufficient evidence to raise a jury question of scienter on this count.

Given all of this, we conclude that Broad's evidence on this count could support no more than a finding of simple negligence by the defendants in failing to disclose the workings of Section 4.11 in the prospectus and other sales materials. Accordingly, we affirm the judgment of the district court with regard to this claim under Rule 10b–5.

B. *The Scheme to Deprive the Holders of Debentures of Their Right to Convert into Common Stock*

■ In his second claim under Rule 10b–5, Broad alleges that the defendants collectively schemed to defraud the holders of Debentures of their right to convert the Debentures into common stock, substituting

therefor a right to convert into cash. The panel opinion affirmed the district court's directed verdict on this claim on the ground that there had been no purchase or sale of the Debentures at the time of the merger because the supplemental indenture did not so substantially change the underlying security as to fall within the forced or constructive sale doctrine. 614 F.2d at 435–39.

We agree that the directed verdict on this count was proper as a matter of law, but we base our decision on a different ground.[31] We have concluded in part II of this opinion, *supra*, that as a matter of law, the holders of Debentures received in the supplemental indenture all to which they were contractually entitled under the Indenture. There is no doubt but that there was concerted, intentional conduct by the defendants to bring about that result. But as a matter of law, there was no violation of section 10(b) or Rule 10b–5 because there was no fraud. "Section 10(b) is aptly described as a catch-all provision, but what it catches must be fraud." *Chiarella v. United States*, 445 U.S. 222, 234–35, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980) (criminal prosecution under section 10(b) and Rule 10b–5). It is elementary that section 10(b) and Rule 10b–5 reach only conduct involving manipulation or deception. *E. g., Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 54, 50 L.Ed.2d 74 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The defendants' conduct involved neither; they merely carried out their contractual obligations. As a conceptual matter, they could not have fraudulently schemed to deprive the holders of Debentures of a right that those holders did not in fact have. Accordingly, we affirm the judgment of the district court with regard to this claim under Rule 10b–5.[32]

## V. CONCLUSION

The district court correctly interpreted the Indenture to provide unambiguously that upon a merger between Collins and another corporation in which Collins was not the surviving company, the sole conversion right of the holders of Debentures was to convert into the kind and amount of property (be it stock, other securities, cash, or other property) that would have been received by a holder of Debentures had he exercised his conversion right immediately prior to the merger. Because there was no question but that the defendants have properly recognized this right, the district court correctly directed a verdict for the defendants on the state-law breach of contract, breach of implied covenant of fair dealing, and breach of fiduciary duty claims. The district court also properly directed a verdict on the first federal securities claim—that the defendants omitted to disclose the workings of Section 4.11 at the time the Debentures were marketed—because Broad's evidence failed to raise a jury question on scienter. Finally, the court properly directed a verdict on the second federal securities claim—that the defendants had schemed to defraud the holders of Debentures of their right to convert into common stock—because as a matter of law, given the correct interpretation of the Indenture, there was no fraudulent conduct and hence no violation of section 10(b) and Rule 10b–5. Accordingly, the judgment of the district court is

**AFFIRMED.**

HENDERSON, Circuit Judge, concurring in part and dissenting in part:

Despite the majority's thorough and exhaustive review of the law of contracts, I

---

**31.** Our prior cases do not clearly answer the question of whether the execution of a supplemental indenture in this context satisfies the requirement of section 10(b) of the Securities Exchange Act of 1934, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), that the complained-of fraud be in connection with a purchase or sale of a security. We specifically reserve this question for some future case in which a decision thereupon is necessary to the

disposition of the case, and we express no opinion as to whether the panel's reasoning and conclusions were correct as an abstract matter.

**32.** Given our holdings on the liability issues in Broad's two claims under Rule 10b–5, we need not reach the district court's alternate ground for the directed verdict—that the holders of Debentures had sustained no actual damages.

adhere to the conclusion reached by the panel—the indenture is ambiguous. It does not clearly contemplate the plaintiffs' conversion rights in the event of a cash-out merger.[1] I would therefore remand the case for a trial to determine the intent of the parties.[2] In all other respects I agree with the majority decision.

Much of the court's extended opinion relates to matters not in dispute. The part that focuses on the questions we confront does not, in my judgment, rebut the panel's conclusion. The panel opinion should, and does, stand on its own, and I see no need for extensive reiteration.

The plaintiffs maintain that upon merger Rockwell was required by § 14.01 of the indenture to "expressly assume[ ]" all of Collins' obligations, including the § 4.01 duty to exchange the debentures for stock. The majority finds this construction precluded by § 4.11. I see no necessary conflict between § 4.11 and § 4.01.[3] A jury could read the indenture to provide that after a merger a debentureholder had conversion rights under at least two sections: a § 4.11 right to convert into what the Collins shareholders received, *and* a § 4.01 right to convert into the "Common Stock of the Company," "the Company" being Rockwell, § 14.02. In stock-for-stock mergers these options would be similar, if not the same. Here however they are distinct. The plaintiffs simply insist that the § 4.11 right is not exclusive. This is a fair interpretation of the contract, and the jury might adopt it.[4]

A brief comment on "the 'Iowa law' argument," *ante* at 951–952. Iowa did not

1. My conclusion is based on what I perceive to be "holes" in the contract not my "instinct for the disposition of equity," *ante* at 947. Nonetheless, I cannot agree with the majority's assessment of the fairness of the outcome of this case, *ante* at 956–957.

 Convertible debentures are a wholly different investment vehicle from common stocks, and are, contrary to the assertion of the majority, presumably purchased by persons with different views of the future. The current price of any security reflects the market's collective judgment of its prospects, with all possibilities discounted for their probability. Conversion rights will be exercised only if profitable, so the probability that the underlying stock will exceed the conversion price is a determinant of the value of a convertible security. But if the stock price stays down, the debentureholder's primary concern will be his interest income. The owners of stock, on the other hand, carry the entire burden of any decline in the value of their shares. All equityholders hope for a bright tomorrow, but the convertible debentureholder, who is also a corporate creditor, pays for protection against a gloomy future.

 Debentureholders accept low interest precisely because they want upside participation without downside risk. The effect of the court's decision is to retain the low interest rate payable to the plaintiffs while denying them a right to participate in increases in the value of Collins' business. And the value of the conversion right has not only been frozen, it has been rendered practically worthless.

 The purchase and sale of a convertible debenture, like that of any other security, is at heart an allocation of risks. Presumably the parties to the indenture considered the likelihood that the market interest rate and the market price of Collins shares would fluctuate during the life of the debentures. They supposedly had different expectations. But this case would not be here if all that was involved was the effect of the market. The question we face is whether the contract ordained that the right to convert into equity could be eliminated. Perhaps the parties did consider the possibility and factored that into the price of the debentures. If they did, so be it. I, like the court, do not suggest that we alter anyone's contract. Were it relevant, however, I would dispute the majority's statement that this merger treated shareholders and debentureholders identically.

2. The court affirms summary judgment on the fair dealing, fiduciary duty and second 10b–5 claims because all contractual obligations were satisfied. This logic is sound, but the holdings stand or fall with their stated premise—that the contract rights of the plaintiffs were respected.

3. The majority opinion does not say that § 4.11 is the exclusive operative section in mergers, but only that it controls in event of conflict.

4. The court is troubled by the indentures' failure to provide a formula for the conversion of Collins debentures into Rockwell stock. This might be enough to convince a jury that the defendants have correctly construed the contract. On the other hand, it may be an inadvertent omission to be rectified with a § 13.01(e) supplemental indenture. *Cf. ante* note 23.

permit cash-out mergers when the debentures were issued, and the plaintiffs suggest that the buyers could have safely assumed that after any merger they would still be entitled to convert into an equity interest in some going business. *Cf. ante* at 941 (convertible security is a debt-equity hybrid). To be sure, specific provisions of the indenture enabled Collins to force the debentureholders to accept cash at any time, but only through liquidation, in which event the debtholders would have been entitled to receive full compensation prior to any distribution to equityholders, or through redemption, for about three times what the court now holds the debentureholders are due.

The majority notes that in reading the indenture, "Due consideration must be given to the purpose of the parties in making the contract, and fair and reasonable interpretation consistent with that purpose must guide the courts in enforcing the agreement." *Ante* at 946.[5] The equity kicker, the whole point of a convertible security, was arguably the price insisted upon by buyers willing to accept a substantially reduced rate of interest. See 614 F.2d at 428. It seems unlikely that the debenture buyers, or for that matter the seller, thought this participation would be as short-lived as it turns out to have been. In any case I am not convinced by the court's treatment of the matter. See 614 F.2d at 429. In fact, to quote the majority opinion, "Had the parties to the contract wished to fashion such a bizarre provision, they certainly would have done so in a more explicit fashion." *Ante* at 950; see also at 953.

The few analogous cases, *ante* at 955–956, may support this view.[6] In *Broenen v. Beaunit Corp.*, 440 F.2d 1244 (7th Cir. 1970), which was purportedly followed by the district court in *Brucker v. Thyssen-Bornemisza Europe N. V.*, 424 F.Supp. 679, 688–90 (S.D.N.Y.1976), *aff'd mem. sub nom Brucker v. Indian Head, Inc.*, 559 F.2d 1202 (2d Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977), the challenged merger was legal at the time the parties entered into the indenture, and therefore the court was able to invoke the "ancient principle of contract law that parties are presumed to have contracted with knowledge of and consistent with the law in effect at the time of execution of a contract." 440 F.2d at 1249 (citing *Mandell v. Cole*, 244 N.Y. 221, 155 N.E. 106 (1926)). This rule of contract construction, perhaps the only one not mentioned in the court's opinion, cuts the other way here. While it may not require a judgment for the plaintiffs, it properly focuses attention on the novel facts of this case, and explains why the § 4.11 boilerplate, *ante* at 962 did not anticipate the substantial change in Iowa law.

---

5. "We are of the opinion that this question [*i. e.*, interpreting an indenture] is not necessarily to be answered by references to the general law concerning the sale of assets of a corporation. The question before us is the narrow one of what particular language of a contract means and is to be answered in terms of what the parties were intending to guard against or to insure."
*B. S. F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746, 750 (Del.1964). *See* note 1, *supra*.

6. The panel properly distinguished *B. S. F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746 (Del. 1964) as involving a sale of assets and not a merger. The Supreme Court of Delaware emphasized this distinction, 204 A.2d at 749, and also pointed out that the holders of the debentures were still entitled to convert into *B.S.F.* common stock, 204 A.2d at 751. Similarly, the court upheld the distribution challenged in *Wood v. Coastal States Gas Corp.*, 401 A.2d 932 (Del.1979), because the indenture specifically provided for distribution of securities to holders of common stock (as opposed to an exchange) without adjusting the conversion ratio of preferred stock. 401 A.2d at 940. Again, the plaintiffs could still convert their preferred into common stock. 401 A.2d at 939–40.